Alisa BRADLEY and Ronald Bradley,
Parents and Next Friends of Rachel
Bradley, Petitioners,

v.

SECRETARY OF the DEPARTMENT
OF HEALTH AND HUMAN
SERVICES, Respondent.

No. 90–975 V.

United States Claims Court.

Dec. 6, 1991.

Paul A. Nelson, Tampa, Fla., for petitioners.

Catherine Reeves Oster with whom were Asst. Atty. Gen. Stuart M. Gerson, Director Helene M. Goldberg, and Deputy Director John Lodge Euler, Dept. of Justice, Washington, D.C., for respondent.

## OPINION

WIESE, Judge.

This case is before the court on a petition for review of the special master's decision, entered September 10, 1991, finding that petitioners' daughter, Rachel Bradley, did not suffer a vaccine-related injury compensable under the terms of the National Childhood Vaccine Injury Act, 42 U.S.C.A. §§ 300aa-1 to 300aa-34 (West 1991) (the Act). The decision reflects the conclusion that petitioners failed to establish, by a preponderance of the evidence, either the occurrence of a "table injury" (an injury in which vaccine causation is presumed) or an injury caused in fact by the administration of a diphtheria-pertussis-tetanus (DPT) vaccine to Rachel on January 30, 1984.

Petitioners seek reversal of the special master's decision; they claim that the decision is contrary to the weight of the evidence and is otherwise erroneous as a matter of law. Respondent opposes petitioners' motion and argues in favor of affirmance. The issues have been briefed and argument with respect to them was heard on November 21, 1991. At the conclusion of the argument, the court announced its decision in respondent's favor. We restate below the reasons for that ruling.

I

Rachel Bradley was born prematurely on July 19, 1983 and was required to remain in the hospital for several weeks after her birth. On September 27, 1983, she was readmitted to the hospital after experiencing spells of irregular breathing and exhibiting a loss of color. She was diagnosed as suffering from apnea (transient cessation of respiration) and from gastroesophageal reflux (regurgitations into the esophagus). After her discharge, Rachel was monitored for cessation of breathing, and fortunately no further trouble was encountered. Clearly, however, Rachel was not a completely healthy baby, even by her mother's own admission.

On December 19, 1983, Rachel received a diptheria-tetanus (DT) inoculation without any noted adverse reaction. Then, on January 30, 1984, she received her first DPT inoculation. According to her mother's testimony, during the days immediately following the January inoculation, Rachel's temperature ranged as high as 104 degrees. Further, Rachel reportedly lost her appetite and exhibited a loss of muscle tone, including the ability to hold her head up. Mrs. Bradley also testified that Rachel

stared vacantly into space for short periods of time and that during these staring episodes remained completely unresponsive to outside stimuli. Mrs. Bradley testified that she telephoned her doctor at least once to express her concern over Rachel's temperature and disposition. However, no visit was made to the doctor's office and no records substantiate the events Mrs. Bradley described as having occurred in the three-day period immediately following the DPT inoculation.

Approximately five months later, Rachel suffered a serious febrile seizure for which she was again hospitalized. At that time, the etiology of the seizure was not established, although it was noted to have occurred in conjunction with an apparent urinary tract infection. Rachel has since endured several other seizures and has been hospitalized on several of these occasions. Also, according to her mother, Rachel has experienced several staring spells similar to those which allegedly occurred following the DPT injection. None of the medical records pertaining to these seizures mention DPT as a possible cause, and none recite any of the events which allegedly occurred subsequent to the January 30, 1984 DPT vaccination. Rachel currently suffers from attention deficit disorder, severe speech and language development delays, and manifests aggressive behavior. She has not had a seizure in several years.

At a hearing conducted by the special master on June 12, 1991, petitioners introduced two experts to establish that Rachel's symptoms following the DPT inoculation, as described by her mother, constituted a "table injury" under the Act, 42 U.S.C.A. § 300aa–14(a), or were the cause-in-fact of her current problems. *Id.* §§ 300aa–11(c)(1)(C)(ii), 300aa–13(a)(1)(A). Dr. John Tilelli, an expert in pediatrics, toxicology, and critical care medicine, testified that Rachel suffered a hypotonic-hyporesponsive collapse (HHE or shock collapse) following the administration of the DPT shot. He came to this conclusion based on the intensity of Rachel's symptoms, their temporal proximity to the inoculation, and the recognized potential of the vaccine to act as the mechanism producing such symptoms. Dr. Roger Morrell, an expert in neurology, testified that Rachel suffered an encephalopathy with related seizure activity within 72 hours of the DPT shot. What led Dr. Morrell to this conclusion were the staring episodes described by Mrs. Bradley, the occurrences when the child appeared unresponsive to outside stimuli, and the sometimes sudden onset of periods of lethargy and listlessness. Both doctors recognized the overlapping nature of their diagnoses.

The respondent's case relied on one witness, Dr. Robert Baumann, an expert in child neurology and epidemiology. It was this expert's opinion that the symptoms described by Rachel's mother were insufficient to establish the occurrence of either an HHE, an encephalopathy, or a seizure disorder. Specifically, Dr. Baumann noted that a shock collapse would have produced far more dramatic and more enduring symptoms than those described by Mrs. Bradley. "Hypotensive hyporeactive shock syndrome," the witness explained, "is a very dramatic, frightening and very serious episode where ... the infant becomes flaccid, unresponsive and stays that way usually for a period of time." Dr. Baumann viewed the symptoms described by Mrs. Bradley as the not-unusual accompaniments of high fever in infants rather than as manifestations of a serious neurological disturbance.

Similar reasoning led Dr. Baumann to reject the occurrence of an encephalopathy. Although not as dramatic an event as shock collapse, Dr. Baumann rejected encephalopathy as a diagnosis because Rachel's illness was not accompanied by inconsolable crying ("this sort of eerie crying that kids do"), her symptoms were of short duration, and she returned to an apparent state of health once the fever was gone. Finally, on the question of whether Rachel had suffered a seizure disorder, the expert saw the staring events as a typical behavior pattern of a sick infant because, as he explained, "[i]t is well known that when you look at little kids like that who are feeling that unwell, they stop responding ... and just sort of sit there and stare."

Further, in response to the notion that Rachel suffered from absence seizures in particular, he noted that "an absence seizure in a baby of this age would be extraordinary."

At the conclusion of the hearing, the special master issued a bench ruling, later augmented by a written decision, reflecting essentially three determinations. First, that the absence of any contemporaneous recordation in Rachel's medical records of the events immediately following the January inoculation rendered suspect the accuracy of Mrs. Bradley's testimony concerning those events and impaired its believability. Second, that Mrs. Bradley's testimony, even when taken at face value, was insufficient to demonstrate the occurrence of a shock collapse, an encephalopathy or seizure related to an encephalopathy. In other words, the special master deemed the clinical evaluation of Mrs. Bradley's testimony by Dr. Baumann more convincing than the evaluations offered by Drs. Tilelli and Morrell. Third, that absent proof of a table injury, the evidence was otherwise insufficient to establish that Rachel's present impairments were caused in fact by the DPT inoculation.

## II

Petitioners challenge the special master's decision on a number of grounds. They contend, first of all, that the remedial purposes of the vaccine legislation and the non-adversarial nature of its proceedings dictated a more hospitable standard in the evaluation of Mrs. Bradley's testimony than that adopted by the special master. Second, petitioners contend that endorsement of Dr. Baumann's evaluation of the clinical evidence was incorrect given this witness' acknowledged uncertainty whether, as a matter of reasonable medical probability, permanent neurological damage could be traced to acute reactions to DPT inoculations. Finally, petitioners contend that they were procedurally disadvantaged by the decisional mechanics adopted by the special master. Their complaint is that the issuance of a written decision by the special master following receipt of petitioners' brief enumerating deficiencies in the spe-

cial master's bench ruling is, in effect, a compression of the trial and appellate processes into one.

■ In considering these arguments we start from the premise that judicial review of a special master's decision is limited in scope. The Vaccine Act permits the court to set aside a special master's decision only where the decision reflects errors of law or contains findings of fact that are "arbitrary, capricious [or] an abuse of discretion." 42 U.S.C. § 300aa–12(e)(2)(B). As recognized in *Hines v. Secretary of Department of Health & Human Services*, 940 F.2d 1518, 1528 (Fed.Cir.1991), the Act accords to the findings of the special master the usual deference due an administrative fact-finder: "[i]f the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." Such is the case here.

■ We consider first petitioners' argument that the special master's rejection of Mrs. Bradley's testimony runs counter to the legislative intention embodied in the Vaccine Act. It is, of course, correct to say that the Vaccine Act intended to establish a procedure that would administer awards "quickly, easily, and with certainty and generosity." *See* H.R.Rep. No. 908, 99th Cong., 2d Sess. 3 (1986), *reprinted in* 1986 U.S.Code Cong. & Admin.News 6287, 6344. This does not mean, however, that the special master must accept, without question, the testimony of a witness simply because that testimony stands unrebutted. The search for truth goes on whether the hearings are formal or not. Thus, the proper discharge of the fact-finding function requires that the truth of the testimony offered be evaluated not only in terms of a witness' demeanor but also by the probative force of attendant circumstances.

In this case, the special master was not persuaded by Mrs. Bradley's testimony. Her own belief in the truth of the events she recounted was not the point questioned. Rather, it was the accuracy of her recollection that the special master had dif-

ficulty with. What chiefly prompted the special master's concern was the absence of any contemporaneous recordation in Rachel's medical records of the events which Mrs. Bradley's testimony described. Those events, as recounted by Mrs. Bradley, were too dramatic to have gone unrecorded. So at least thought the special master. He said the following in his bench ruling:

> [I]f Ms. Bradley had ever given doctors the same description of Rachel's behavior in the three-day period that she now has given to me, a note of that description would be somewhere in the medical records here.

Continuing with the same thought, the special master said:

> I think that if in fact Rachel's behavior during the crucial three days had been as dramatic as Ms. Bradley testifies, that she had not been able to get the child's attention whatsoever, for a period of a minute or so a number of repeated times, that the child would have ended up at a doctor's [office].

In addition to the absence in Rachel's records of any medical notation of the events recounted in Mrs. Bradley's testimony, the special master also noted a lack of certainty in Mrs. Bradley's testimony concerning her daughter's regression in development. The special master's bench ruling points out that, on cross-examination, Mrs. Bradley was unable to state with any certainty when her daughter lost the ability to sit up unaided.

This uncertainty, coupled with the unexplained lack of recordation of neurologically significant events, led the special master to conclude that Mrs. Bradley's testimony was the product of a faulty memory—one disadvantaged by the remoteness of the events involved (they occurred some seven years prior to the hearing), or else one perhaps unconsciously influenced by a television documentary concerning adverse reactions to DPT inoculations. (In her testimony, Mrs. Bradley explained that it was the information learned in a then-recent television documentary that first caused her to draw a connection between her daughter's afflictions and the DPT inoculation). Whatever the reason, the upshot was that the special master did not find Mrs. Bradley's testimony factually reliable. He concluded, therefore, that the occurrence of table injuries had not been established.

■ Was the special master acting within permissible bounds in rejecting Mrs. Bradley's testimony? The answer is yes. Reasonable inferences—meaning such inferences as are born of common experience or are the product of a decision maker's special expertise—are within the rightful province of the decider of fact to make. *Federal Trade Comm'n v. Pacific States Paper Trade Ass'n*, 273 U.S. 52, 63, 47 S.Ct. 255, 258, 71 L.Ed. 534 (1927). Thus, a decision based on such inferences, where those inferences are persuasive in their own right, is a decision based on substantial evidence and therefore cannot be labeled "arbitrary or capricious." [1]

The special master's conclusion that the absence of any medical recordation of Rachel's post-inoculation symptoms was more telling than Mrs. Bradley's testimony was clearly reasonable given the dramatic nature of the symptoms claimed, the close medical attention that has been focused on Rachel since the time of her birth (including five visits to a pediatrician *after* the January inoculation and before she was diagnosed with seizures in late May, 1984), and Mrs. Bradley's self-described preoccupation with her daughter's state of health as "a very paranoid mother of a baby with many problems." The rejection of Mrs. Bradley's testimony was a legitimate exercise of the special master's fact-finding function.

---

1. In *Association of Data Processing Service Organizations, Inc. v. Board of Governors of the Federal Reserve System*, 745 F.2d 677, 683 (D.C.Cir. 1984), then Circuit Judge Scalia observed that "in their application to the requirement of factual support the substantial evidence test and the arbitrary or capricious test are one and the same. The former is only a specific application of the latter, separately recited in the APA not to establish a more rigorous standard of factual support but to emphasize that in the case of formal proceedings the factual support must be found in the closed record as opposed to elsewhere."

The second ground on which petitioners seek reversal of the special master's decision involves the decision's acceptance of the testimony of respondent's expert, Dr. Baumann. Petitioners point out that, during cross-examination, Dr. Baumann acknowledged doubt about whether existing medical data demonstrated, to a reasonable degree of certainty, a causal relationship between DPT inoculations and permanent neurological injury. Said Dr. Baumann: "I think the data unclear, and I think that remains an open question." Based on this acknowledgment, petitioners contend that Dr. Baumann was not, in fact, an unbiased expert capable of providing an objective evaluation of the evidence but, rather, one predisposed to take a position against them. That is to say, he held out the danger of being an advocate for his own cause.

The argument is not valid. Dr. Baumann's testimony was not directed to the issue of whether DPT inoculations were a cause-in-fact of permanent neurological damage. Rather, his testimony went to the question whether the behavior exhibited by Rachel during the 72–hour period following the January inoculation (as described by Mrs. Bradley) fit within the contours of a table injury. The question was simply whether a given injury had occurred, not what caused it. Dr. Baumann's uncertainty about the latter had nothing to do with his ability to render an objective evaluation in regard to the former. Indeed, his testimony makes that point clear:

> [W]hat I'm telling you is for purposes of this legislative Act [the Vaccine Act], I am perfectly willing and have so advised the vaccine injury people that there are kids who have had permanent injury in association with DPT, and for the purposes of this Act, I have told them that there are kids who I think have [not].

Given Dr. Baumann's professional qualifications and the assurances of his objectivity, there was no reason his testimony should have been discounted by the special master.

The last point petitioners raise on appeal concerns the decisional mechanics which

the special master followed. At the conclusion of the hearing, the special master rendered a bench ruling which recited, with substantial factual detail, the reasons why petitioners' evidence was insufficient to warrant an award of compensation. After dealing with the case on the merits, the special master explained that, given the massive workload facing the Office of Special Masters, dispositions by bench ruling had become a necessity. The special master then went on to say that, if his bench ruling had been unclear or the reasons relied on erroneous, then petitioners could file a statement enumerating their disagreements with the bench ruling and he (the special master) would then address these points in a written decision.

This was the procedure that was followed here and it is about this procedure that petitioners now complain. They say, first of all, that the special master failed to make focused findings and conclusions of law and "merely issued a bench ruling denying the Petitioners' claim." Secondly, petitioners complain that they were ordered to file "an unprecedented written memorandum specifying the errors in his [the special master's] bench ruling." They refer to this call for a statement outlining errors in the bench ruling as an "arbitrary and capricious" demand—one that placed them in the position of having to argue before the special master issues that properly belonged to the case on appeal.

These are not valid criticisms. To start with, the special master's summation and evaluation of the evidence at the end of the hearing went well beyond what petitioners have disapprovingly referred to as "merely ... a bench ruling." That bench ruling, which took up nine full pages of the transcript, provided a well organized evaluation of the case that addressed all factually and legally significant considerations. That the decision was cast in conversational tones (it was, after all, a spoken decision) does not mean—as petitioners' argument seems to suggest—that the facts it sets forth lack the formality necessary to be considered findings of fact. *See, e.g.,* RUSCC 52(a) ("It will be sufficient if the

findings of fact and conclusions of law are stated orally...."").

 Findings of fact have no special form. Rather, they are simply reference points to those propositions of fact which the decision maker has drawn from the evidence and on the basis of which a decision is reached. Nothing in this court's rules or in the rules governing procedures before the special masters requires findings of fact to exhibit "punctilious detail" or a "slavish tracing of the claims issue by issue and witness by witness." *Krieger v. Gold Bond Bldg. Prods.*, 863 F.2d 1091, 1097 (2d Cir.1988) (quoting *Ratliff v. Governor's Highway Safety Program*, 791 F.2d 394, 400 (5th Cir.1986)). All that is required is that findings of fact be "sufficiently detailed ... to inform the appellate court of the basis of the decision and to permit intelligent appellate review." 863 F.2d at 1097. Even a casual reading of the special master's decision makes clear the factual bases for his conclusions. The criticism that the decision lacks findings is wrong.

As to petitioners' other criticism of the special master's decisional mechanics, it is hard to understand how one can find fault with a procedure that, in effect, grants a litigant a second full opportunity to argue his case before the decision maker. That is precisely the benefit petitioners obtained from the special master's procedures. Petitioners, however, see more disadvantage than benefit in these procedures. Their complaint seems to be that, by inviting them to file a statement calling out errors or unclarities in the bench ruling, the petitioners helped "perfect" (their word) the special master's decision while simultaneously narrowing the grounds for appeal.

We cannot accept this argument. The sporting theory of justice, which seems to be the argument's implicit premise, has absolutely no place in modern litigation. Like all litigation, appeals from trial bench decisions should be pursued only where there are bona fide disputes remaining unresolved. Therefore, a procedural system that helps get a case decided correctly the

first time around is surely to be preferred to one that demands an appellate intermediary to accomplish that goal.

There was nothing wrong with the procedure adopted by the special master. Indeed, he is to be commended for the wise use of his office's resources. The bench ruling issued by the special master was clear, cogent, and convincing. The case should have ended there.

### III

For the reasons stated, the decision of the special master entered September 10, 1991 is affirmed.