**Linda L. McCUMMINGS, Petitioner,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent.**

**No. 90–903V.**

United States Court of Federal Claims.

Dec. 23, 1992.

Keith W. Donahoe, Washington, DC, for petitioner.

Caroline F. Gosse, Washington, DC, for respondent.

OPINION

ROBINSON: Judge.

*Introduction*

On September 10, 1990, petitioner filed a request for compensation under the National Childhood Vaccine Injury Act (the "Vaccine Act" or the "Act"), 42 U.S.C. §§ 300aa–1 to –34 (1988), *amended by* several public laws (codified as amended at 42 U.S.C.A. §§ 300aa–1 to –34 (West Supp. 1992)), on behalf of her daughter, Heather McCummings. Chief Special Master Gary Golkiewicz concluded, on July 10, 1992, that petitioner was not entitled to compensation under the Act. *McCummings v. Secretary of HHS,* No. 90–903V, 1992 WL 182190 (Cl.Ct.Spec.Mstr. July 10, 1992). This matter is now before the court on petitioner's request for review of the Chief Special Master's entitlement decision. Petitioner objects to the Chief Special Master's decision on two grounds: 1) the Chief Special Master applied an impermissible burden of proof, and 2) the Chief Special Master improperly weighed the evidence before him.[1] For the following reasons,

---

**1.** Petitioner does not dispute that she bore the burden of proof since Heather's injury is an off-Table injury. Heather was diagnosed as having transverse myelitis. Petitioner does not contend that this disease is a Table injury. *See* 42 U.S.C. § 300aa–14(a) & (b). Even if the disease were a Table injury, however, petitioner would still bear the burden of proof, since the injury occurred five days after the inoculations—beyond the period in which the statute creates a presumption of causation in favor of petitioners. *McCummings,* slip op. at 1 n. 2, 14.

the court affirms the Chief Special Master's decision.

### Background

#### A. Medical History.

Heather McCummings was born on July 21, 1980, after an uncomplicated pregnancy and delivery by Cesarean section. Pet.Ex. B(1) at 5.[2] Heather's physician first examined her on August 4, 1980. At that time, the practitioner told petitioner that Heather was "doing well." During a September 23, 1980 appointment, Heather received her first diphtheria-pertussis-tetanus (DPT) and oral polio vaccine (OPV) vaccinations. Pet. Ex.B(2) at 7–8; Tr. at 13. On February 16, 1981, Heather received her second set of DPT and OPV vaccinations. Pet.Ex.B(2) at 7.

Five days after the second administration of the vaccines, on February 21, 1981, petitioner observed that Heather was unable to move her legs or sit up. Pet.Ex.B(4) at 23, 24; Pet.Ex.B(5) at 30, 32, 34. Heather was admitted to Hartford Memorial Hospital on February 23, 1981, with a diagnosis of probable transverse myelitis. Pet.Ex.B(3) at 15. Dr. Douglas Abbott conducted a neurological examination of Heather on the day of her admission. He surmised that she was suffering from transverse myelitis secondary to the vaccinations. He recommended that she be transferred to the University of Maryland Hospital for further evaluation. Pet.Ex.B(4) at 23.

At the hospital, Heather underwent a number of diagnostic examinations. Dr. Margaret Rennels examined Heather for infectious diseases on February 24, 1981. She noted in her files that Heather had experienced a slightly runny nose and a temperature of 100 degrees on February 21. The fact that Heather had received the OPV and DPT vaccines five days before the onset of symptoms was "of concern." The doctor also noted that a very small number of polio vaccine recipients develop paralysis, but the typical conditions were different from those Heather suffered.

"Other possibilities" for Heather's symptoms included Guillain–Barre and transverse myelitis "which are associated with a number of infections." She recommended serologic tests for several viruses. Pet.Ex. B(5) at 32–33.

Heather was also examined by Dr. Maria Gumbinas on February 24, 1981. Dr. Gumbinas diagnosed Heather as having transverse myelitis, which was already improving. She noted in her records that it was "temporally related to DPT and Polio vaccine[, but she ruled] out direct viral infection with polio, coxackie, ECNO." Pet.Ex. B(5) at 34. According to a May 1981 letter from Dr. Rennels -to Dr. Gumbinas, that described the serology titers and viral cultures done on Heather, the immunological workup was normal. Dr. Rennels also noted that it probably would not be possible to determine either: "1) the etiology of [Heather]'s paresis, or 2) whether or not it was vaccine related." Pet.Ex.B(5) at 48.

Dr. Huang, a pediatric immunologist, was consulted on February 26, 1981. Pet. Ex.B(5) at 37. He observed that it was "prudent to think the paralysis was related" to one of the vaccinations because of the close timing between the immunizations and the onset of the illness. However, in his consultation, he also advised of a UCLA study of 3000 cases of individuals who received DPT or DT vaccinations. In some instances the vaccinations were followed by seizures or "CNS involvement[, but] [n]o case of paralysis was reported." Pet.Ex.B(5) at 37.

As a consequence of the transverse myelitis, Heather underwent two surgeries. She now has decreased movement in her right foot and ankle, and she uses a brace for her foot at night. She is also burdened with performing urinary self-catheterization every four hours.

#### B. Expert Testimony.

At the hearing before Chief Special Master Golkiewicz, on April 16, 1992, petitioner presented the testimony of Dr. Shlomo

---

**2.** "Pet.Ex." refers to the affidavits and documents filed by petitioner in this matter. "Tr." refers to the official transcript of the hearing held before Chief Special Master Golkiewicz on April 16, 1992.

Shinnar, a board certified neurologist with special competence in child neurology and pediatrics. Dr. Shinnar agreed with the diagnosis of transverse myelitis. Tr. at 33.

Dr. Shinnar explained that transverse myelitis generally occurs in two settings. First, the disease may occur as a hyper-immune response to a variety of agents, such as, a prior viral infection, an antigen in the body, and smallpox immunizations. Second, transverse myelitis may occur as part of an acute viral syndrome, such as, with the Epstein–Barr virus, the mononucleous virus, or the influenza virus. Tr. at 34.

Since the medical records showed "no definitive evidence of an acute viral syndrome," Dr. Shinnar, during his testimony, discounted that possibility as a cause of Heather's transverse myelitis. Tr. at 36–38. Rather, he concluded that it was "more likely than not" that the immunizations, which Heather received five days earlier, caused the transverse myelitis. Tr. at 33–34. Dr. Shinnar explained that transverse myelitis at a young age is "a very rare entity." Thus, he attributed, greater weight to the fact that the inoculations occurred temporally close to the onset of the disease than he would have if the two occurrences were relatively common. Tr. at 47.

Dr. Shinnar continued theorizing that, since rabies and smallpox vaccinations are associated with transverse myelitis in the medical literature, it makes sense, from a medical standpoint, to consider the possibility that another immunization, such as the DPT, could cause the disease. Tr. at 72–73. As support for this conclusion, Dr. Shinnar cited a case study reported in the British Medical Journal.[3]

Respondent's expert, Dr. William Robertson, who is board certified in neurology and pediatrics, agreed with Dr. Shinnar that the diagnosis of transverse myelitis was accurate; however, Dr. Robertson opined to a reasonable degree of medical certainty that Heather's transverse myelitis was caused by a viral infection, not by

the immunizations. Tr. at 147. Dr. Robertson testified that he believed Heather's runny nose and low grade fever were symptoms of a virus. Tr. at 149. Although Dr. Robertson admitted that no scientific evidence exists to support the theory that transverse myelitis can be caused by a virus, he believed a causal relationship existed because medical literature documents that a viral infection may occur concomitantly with the manifestation of transverse myelitis. Tr. at 161, 175.

Finally, Dr. Robertson disputed Dr. Shinnar's reliance upon the Whittle article for the proposition the DPT or OPV vaccine can cause transverse myelitis. First, he noted that the authors of the article only proposed an association between the vaccines and transverse myelitis; they did not conclude that the vaccines caused the disease. Tr. at 150–51. Second, Dr. Robertson pointed out that the infant, whose case was the subject of the Whittle article, had symptoms which suggested that the child may have had a viral infection prior to or concurrent with her development of transverse myelitis. Tr. at 151.

### Contention of the Parties

Petitioner contends that Chief Special Master Golkiewicz applied an impermissible burden of proof, and that he improperly weighed the evidence before him. Respondent argues that petitioner misconstrues both the law governing her evidentiary burden and the Chief Special Master's application of the law to petitioner's case. Respondent adds that the Chief Special Master's decision was reasonable in light of the evidence before him.

### DISCUSSION

The Vaccine Act grants the Court of Federal Claims jurisdiction to review the decision of a special master. Before the Act was amended in 1989, the court possessed greater latitude for review than it currently does. It could review findings of fact and conclusions of law made by a

3. E. Whittle, *Transverse Myelitis after Diphtheria, Tetanus, and Polio Immunisation,* British Medical Journal 1:1450 Vol. 1, June 4, 1977 [hereinafter the Whittle article].

special master and make a "de novo determination of any matter." 42 U.S.C. § 300aa–12(d)(1) (1988) (amended 1989). Recent amendments to the act have limited the court's authority by "preclud[ing] de novo review in the [Court of Federal Claims] of a decision of a special master." *Hale v. Secretary of HHS*, 22 Cl.Ct. 403, 405 (1991).

Under the amended Act, the court may either uphold, remand, or set aside the findings of fact or conclusions of law of a special master. 42 U.S.C. § 300aa–12(e)(2). However, the court may upset such findings and conclusions only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 42 U.S.C. § 300aa–12(e)(2)(B). [The court may then] issue its own findings of fact and conclusions of law." *Id.*

In *Hines ex rel. Sevier v. Secretary of HHS*, 940 F.2d 1518 (Fed.Cir.1991), the United States Court of Appeals for the Federal Circuit discussed the arbitrary and capricious standard at length, but declined to adopt any exact formulation of the standard for vaccine cases. *Id.* at 1528. It remarked, however, that, regardless of the precise definition, " 'arbitrary and capricious' is a highly deferential standard of review." *Id.* The court explained that "[i]f the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Id.* After carefully considering petitioner's contentions and Chief Special Master Golkiewicz's decision, this court cannot say that the prior decision was arbitrary or capricious; indeed, this court finds the Chief Special Master's decision thorough, articulate, and well-reasoned.

A. *Petitioner's Burden of Proof.*

Petitioner first charges that the Chief Special Master required the incorrect burden of proof from her to substantiate her claim. This court finds no misapplication of the legal standards involved in this action.

■ Chief Special Master Golkiewicz correctly stated that, under the Vaccine Act, petitioner is required to demonstrate causation-in-fact by a preponderance of the evidence. *McCummings*, slip op. at 14. As he explained, "[t]he burden rests on the petitioner to show that the vaccination ... more likely than not caused the [transverse myelitis], under the same standards which apply in traditional tort litigation." *Id.* at 14 (citing *Hines* at 1525).

In *Grant v. Secretary of HHS*, 956 F.2d 1144 (Fed.Cir.1992), the Federal Circuit discussed the burden which the petitioner faces in proving causation-in-fact:

[P]etitioner must show a medical theory causally connecting the vaccination and the injury.... [This] requires proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury. A reputable medical or scientific explanation must support this logical sequence of cause and effect.

*Id.* at 1148 (citations omitted).

The Chief Special Master expressly recognized that this case is one of first impression since "there are no epidemiological studies or other hard medical evidence to prove or disprove the cause of transverse myelitis in children." *McCummings*, slip op. at 15. Thus, he concluded that it falls "squarely within the parameters" set in *Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529 (D.C.Cir.), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984), a case involving the novel causation issue of whether paraquat, a toxic herbicide, causes pulmonary fibrosis. There being no generally accepted theory of causation for transverse myelitis in children, the Chief Special Master followed *Ferebee* and decided this case by "looking at the expert's reasoning, how the limited medical information supports that reasoning, and whether the reasoning is logically sound and in accordance with generally accepted medical practice." *McCummings*, slip op. at 18–19.

Petitioner claims that, in spite of the Chief Special Master's language, he required petitioner to prove her case to the degree of a medical certainty. Petitioner confuses the Chief Special Master's use of

"medical certainty" with his use of "preponderance of the evidence." Although the court understands petitioner's confusion, the court, nevertheless, finds that the Chief Special Master imposed the correct burden of proof on petitioner—preponderance of the evidence.

The phrase "reasonable degree of medical certainty" relates to a medical expert's opinion. It can refer to the expert's level of confidence in the opinion, or the phrase can refer to the weight or credibility the finder of fact allocates to the expert's opinion. This court is convinced that Chief Special Master Golkiewicz's discussion of Dr. Shinnar's testimony, as is highlighted above, reveals, not that the Chief Special Master required petitioner to prove her case to a medical certainty, but that the Chief Special Master was skeptical of Dr. Shinnar's theory of causation. The Chief Special Master's application of the standard of "preponderance of the evidence" to petitioner's case as a whole, including Dr. Shinnar's testimony, is evident and proper.

## B. *Chief Special Master's Consideration of the Evidence.*

█ Petitioner next contends that the Chief Special Master improperly weighed the evidence before him. This court finds to the contrary.

The manner in which a special master weighs the evidence to reach his conclusion, however, is subject to deference by the reviewing court. The review standard legislated in 42 U.S.C. § 300aa–13(b)(1) encapsulates the longstanding rule evolved in case law "that an expert opinion, even uncontroverted, is not binding on the trier of fact." *Thibaudeau v. Secretary of HHS*, 24 Cl.Ct. 400, 403 (1991). "[T]he proper discharge of the fact-finding function requires that the truth of the testimony offered be evaluated not only in terms of a witness' demeanor but also by the probative force of attendant circumstances." *Bradley v. Secretary of HHS*, 24 Cl.Ct. 641, 644 (1991).

Chief Special Master Golkiewicz carefully considered the expert testimony from Dr. Shinnar, for petitioner, and Dr. Robertson, for respondent. The Chief Special Master weighed each element of Dr. Shinnar's conclusion that Heather's transverse myelitis was caused by the DPT vaccine. *McCummings*, slip op. at 5–11. He discussed in detail the three bases for Dr. Shinnar's conclusion: 1) anecdotal reports in the Whittle article that linked the vaccine with the disease; 2) the absence of proof that the vaccines could not cause the disease; and 3) the lack of evidence that a viral infection caused the disease. *Id.* at 20–25.

When questioned by the Chief Special Master about the lack of medical literature, other than the Whittle article, suggesting a link between the vaccinations (the DPT vaccination in particular) and transverse myelitis, Dr. Shinnar answered that after publication of a few cases linking the vaccinations to the disease, other reports would be published only if they documented a series of such associations or present a new piece of evidence. Tr. 118. Dr. Robertson countered, that, given the rareness of transverse myelitis and the small number of reported cases, clinicians would "be anxious to report every case." Tr. at 152–53. Thus, Dr. Robertson stated, if a cause and effect relationship actually exists between the vaccines and transverse myelitis, he would expect corroboration of the association in medical textbooks or that additional cases would be reported. Tr. at 193.

Further questioning of Dr. Shinnar revealed that even the basic premise of the Whittle article, "that the transverse myelitis occurred during the time frame one would expect to see reactions to immunizations[,] . . . is no longer valid." Tr. at 120. The Chief Special Master found that, because the premise of the case study in the Whittle article was invalid and he was persuaded by Dr. Robertson's testimony, "Dr. Shinnar is without anecdotes upon which to rely." *McCummings*, slip op. at 21. The Chief Special Master drew a plausible inference from the evidence before him.

Dr. Shinnar's second point, that since transverse myelitis is associated with some immunizations it should be linked with others, is likewise not well-supported in the

literature. Dr. Shinnar dismissed this paucity because 1) the disease is rare, and 2) there is a lack of comprehensive studies investigating the connection between the disease and the DPT vaccination. Dr. Shinnar concluded, "[Y]ou would not expect in studies of certainly less than a million and maybe even more to find more than an anecdotal association." Tr. at 54.

Chief Special Master Golkiewicz drew a different, but entirely plausible, inference from the lack of support in the medical literature for Dr. Shinnar's theory—that there is no well-documented link between the disease and the OPV or DPT vaccinations. The Chief Special Master concluded:

[The lack of studies] begs the question of why are [sic] there are no anecdotes, case reports, or any literature questioning even the possible relationship between DPT and transverse myelitis.... From both the logical and legal standpoint, Dr. Shinnar's theory that all immunizations may be associated with transverse myelitis is unexplained, ill-supported and therefore deficient.

*McCummings*, slip op. at 23.

The Chief Special Master found further fault with Dr. Shinnar's conclusion because the expert dismissed the possibility that an asymptomatic virus had caused the disease. *McCummings*, slip op. at 23. Dr. Shinnar arrived at this result on the basis of statistics taken from the Guillain–Barre model, but he made no effort to establish the "medical correctness of such an analogy" to transverse myelitis. *Id.* at 23–24. Accordingly, the Chief Special Master concluded that "Dr. Shinnar neither produce[d] convincing testimony to rule out what he concede[d] to be a possible cause—the asymptomatic virus—nor provide[d] any evidence to point to the DPT or polio vaccine." *Id.* at 24. The Chief Special Master did not, as petitioner contends, require Dr. Shinnar to disprove the possibility of an asymptomatic virus as the cause of the transverse myelitis.[4] Rather, the Chief Special Master found that Dr. Shinnar dis-

missed the possibility of this cause, without showing that it merited such dismissal. *Id.* Therefore, the Chief Special Master concluded that "Dr. Shinnar fail[ed] to provide a 'reputable medical or scientific explanation.'" *Id.* at 25 (quoting *Grant* at 1148).

Finally, the Chief Special Master found Dr. Shinnar's opinion insufficient to establish that the vaccines caused Heather's transverse myelitis. *Id.* The Chief Special Master determined that Dr. Shinnar's reasoning was flawed by his over-reliance on the temporal association between the DPT vaccination and the injury: "Dr. Shinnar's entire analysis is based on an intervening event that theoretically could cause a hyper-immune response." *McCummings*, slip op. at 25. Numerous cases have rejected an exclusive reliance on temporal associations. *E.g., Grant v. Secretary of HHS*, 956 F.2d 1144, 1148 (Fed.Cir.1992) ("Temporal association is not sufficient ... to establish causation in fact."); *Hasler v. United States*, 718 F.2d 202, 205 (6th Cir.1983) ("[W]ithout more, [a]proximate temporal relationship will not support a finding of causation."), *cert. denied*, 469 U.S. 817, 105 S.Ct. 84, 83 L.Ed.2d 31 (1984); *Strother v. Secretary of HHS*, 18 Cl.Ct. 816, 820 (1989) ("Temporal association of the onset of injury with the vaccine is not sufficient ... to establish causation in fact."). Although the Chief Special Master, here, found that petitioner's expert witness was credible and knowledgeable, he concluded that "Dr. Shinnar's theory of causation [was] not supported by any current medical literature, and fail[ed] to establish that the DPT vaccine caused Heather's transverse myelitis." *McCummings*, slip op. at 25. This court finds that the Chief Special Master properly weighed the evidence in reaching these conclusions.

## CONCLUSION

Chief Special Master Golkiewicz found that petitioner was unable to demonstrate that the vaccinations caused Heather's transverse myelitis. Once he found that

---

**4.** Petitioner contends that this is patently unfair because an asymptomatic virus, by definition, occurs without symptoms.

petitioner failed to meet her burden of proof, the Chief Special Master did not need to, and did not, determine what did cause the disease in this case. This result is not surprising given that physicians have yet to solve the mystery of what causes transverse myelitis in infants. The court will not attempt to solve the mystery either. This court need only find that the Chief Special Master's decision was not arbitrary or capricious, that the Chief Special Master did not abuse his discretion, and that the decision was otherwise in accordance with the law. The court so finds; the decision of the Chief Special Master is affirmed.