Frank V. SNYDER, Jr., an Incompetent,
by Teresa L. SNYDER, His Legal
Guardian, Petitioner,

v.

SECRETARY OF the DEPARTMENT
OF HEALTH AND HUMAN
SERVICES, Respondent.

No. 90–3430V.

United States Court of Federal Claims.

Aug. 29, 1996.

Boyd A. England, Doylestown, PA, for petitioner.

Vincent Matanoski, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for respondent.

## ORDER

MILLER, Judge.

This matter is before the court on a motion for review of a special master's dismissal of a petition for compensation brought under the National Childhood Vaccine Injury Act of 1986. 42 U.S.C. §§ 300aa–1–300aa–34 (1994). The primary issue is whether the special master's finding that petitioner's son did not suffer the first symptom or manifestation of the onset of an encephalopathy within 72 hours of his third DPT vaccination was arbitrary and capricious. Argument is deemed unnecessary.

## FACTS

The following facts found by the special master or in the record before the special master are not contested, unless otherwise noted. Teresa Snyder ("petitioner") filed a vaccine-related injury claim for compensation on behalf of her incompetent son, Frank V. Snyder, Jr., on October 1, 1990. Frank was born on June 11, 1957. Frank's parents, Teresa and Frank, Sr., testified by way of affidavits and oral examination that Frank was a healthy child for the first six months of his life. By the age of six months, Frank could use his arms to elevate himself while lying on his stomach, roll from his side to his back, grasp objects with one hand, hold his bottle with two hands, and sit on his mother's lap unsupported.

Frank received three DPT vaccinations in October, November, and December 1957 at the office of Dr. Stanley Budzynski. Petitioner argues that the third vaccination caused Frank to suffer an encephalopathy. No contemporaneous medical records exist documenting the exact date of the third DPT vaccination. Mr. and Mrs. Snyder, however, state that the third DPT vaccination was administered on December 30, 1957.[1]

According to petitioner, Frank's temperature rose to 103 within hours of the third DPT vaccination. Petitioner became concerned and telephoned Dr. Budzynski's office. Dr. Budzynski informed petitioner that Frank's reaction was normal and prescribed an unidentified medication over the phone to combat the fever. Although Frank's fever returned to normal within a few days of the vaccination, petitioner testified that Frank's behavior and mannerisms changed:

> Well, he cried. He just couldn't seem to be consoled. He—and he developed a different cry from what he had earlier. Now, all babies cry. They cry when they're hungry or they're wet. . . .

> But this was different. It was different. It was, it was like a screech, like a high pitch screech.

> And I kept asking the doctor about it over the telephone. He said, oh, he'll be all right. He'll be all right. He'll be okay in a couple of days.

Transcript of Proceedings, *Snyder v. Secretary of DHHS* (No. 90–3430V), at 12–13 (Fed.Cl.Spec.Mstr. April 24, 1996) (hereinafter "Tr."); *see Snyder v. Secretary of DHHS*, No. 90–3430V, slip op. at 4 (Fed.Cl. Spec.Mstr. June 19, 1996). Petitioner also

---

1. Frank's parents offer December 30, 1957, as the date of the third DPT vaccination based on their annual family rituals. Mr. Snyder usually took off from work the week between Christmas and New Year's. Because petitioner did not drive at the time, the Snyders scheduled doctors' appointments when Mr. Snyder was not working. Mr. and Mrs. Snyder always entertained friends on the Saturday following Christmas. The Saturday following Christmas, 1957 was Saturday, December 28, 1957. Therefore, Frank's parents surmised that they took Frank to Dr. Budzynski for his third DPT vaccination on Monday, December 30, 1957. *See Snyder v. Secretary of DHHS*, No. 90–3430V, slip op. at 3 n. 7 (Fed.Cl.Spec.Mstr. June 19, 1996).

testified that Frank lost many of his previously achieved developmental milestones. Frank could no longer hold his bottle, roll over or sit without support. Frank "would get a very blank look to his eyes and like he was just staring at nothing. And then after that, he would go to sleep and he would spend a lot of time sleeping." Tr. at 13.

Frank began to regain his developmental milestones at seven or eight months of age.[2] Petitioner testified that Frank never fully regained his alertness and had difficulty learning after the December 30, 1957 vaccination. Frank did not walk until age two and did not talk until age four. A 1977 IQ test revealed that Frank had a full-scale IQ of 59.

When Frank was three and one-half years old, his parents became extremely concerned with his lack of development. Over the next several years, they took him for several evaluations to determine the cause of his problems. The existing medical records from these evaluations do not reference any abrupt loss of developmental milestones in 1957–58.

On April 24, 1996, the special master held an evidentiary hearing "on factual matters only." *Snyder,* slip op. at 3. The special master did not allow any expert testimony at the hearing, explaining that "[b]efore considering any medical expert testimony on that issue [whether Frank suffered an on-table injury], I must first determine whether the factual allegations made by the witnesses ... accurately reflect Frank's actual medical history."[3] *Id.* at 6. The special master heard the testimony of petitioner; Mr. Snyder; and Mary Louise Melso, Frank's cousin who baby sat for Frank both before and after the December 30, 1957 vaccination. After considering the testimony, Special Master Eliza-

beth E. Wright issued a decision on June 19, 1996, denying petitioner's claim.

## DISCUSSION

### 1. *Standard of review*

■ On review of a decision by a special master, the United States Court of Federal Claims is authorized to "set aside any findings of fact or conclusion[s] of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law...." 42 U.S.C. § 300aa–12(e)(2)(B). The court reviews issues of fact finding under the arbitrary and capricious standard, questions of law "under the 'not in accordance with law' standard; and discretionary rulings under the abuse of discretion standard." *Neher v. Secretary of DHHS,* 984 F.2d 1195, 1198 (Fed.Cir.1993) (quoting *Munn v. Secretary of DHHS,* 970 F.2d 863, 870 n. 10 (Fed.Cir. 1992)); *see Youngblood v. Secretary of DHHS,* 32 F.3d 552, 554 (Fed.Cir.1994). According to the Federal Circuit, " 'arbitrary and capricious' is a highly deferential standard of review." *Hines v. Secretary of DHHS,* 940 F.2d 1518, 1528 (Fed.Cir.1991). Thus, "[i]f the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Id.*

### 2. *Statutory requirements*

Under the Vaccine Act, a petitioner can establish a prima facie case for compensation by showing that one

> sustained, or had significantly aggravated, any illness, disability, injury, or condition

---

2. Petitioner challenges the special master's finding that Frank regained his developmental milestones at seven or eight months of age as "factually incorrect." Pet's Br. filed July 19, 1996, at 16–17. According to petitioner, Frank regained his milestones at "7 or 8 months after the immunization," not at age seven or eight months. *Id.* at 17. A review of the record reveals that petitioner, in fact, did testify that Frank began to regain his developmental milestones at seven or eight months of age. *See* Tr. at 14–15. Petitioner then testified that Frank regained his ability to sit up at approximately ten months of age. *Id.*

Given this ambiguity, the special master did not err.

3. Petitioner does not challenge the special master's decision to hear only lay factual testimony at the evidentiary hearing. The court notes, however, that the Federal Circuit has approved this method of trial management. *Burns v. Secretary of DHHS,* 3 F.3d 415, 417 (Fed.Cir.1993); *see Skinner v. Secretary of DHHS,* 30 Fed.Cl. 402, 409–10 (1994).

set forth in the Vaccine Injury Table in association with [a] vaccine ... and the first symptom or manifestation of the onset or of the significant aggravation of any such illness, disability, injury or condition or the death occurred within the time period after vaccine administration set forth in the Vaccine Injury Table....

42 U.S.C. § 300aa–11(c)(1)(C)(i). The Vaccine Injury Table states that the "[t]ime period for first symptom or manifestation of onset or of significant aggravation after vaccine administration" for encephalopathy is "3 days." 42 U.S.C. § 300aa–14(a)I. The qualifications and aids to interpretation state that "[t]he term 'encephalopathy' means any significant acquired abnormality of, or injury to, or impairment of function of the brain." 42 U.S.C. 300aa–14(b)(3)(A). The neurological signs and symptoms of encephalopathy include "changes lasting at least 6 hours in level of consciousness ... high pitched and unusual screaming, persistent unconsolable crying, and bulging fontanel...." *Id.*

### 3. *Petitioner's evidence*

Petitioner argues that "the Master has failed [to] consider the evidence in the record as a whole, or alternatively, has failed to address the evidence." Pet's Br. filed July 19, 1996, at 16. The special master explained the basis for denying petitioner's claim, as follows:

In this case there is a conspicuous absence in any contemporaneous or subsequent medical record of any association, temporal or otherwise, between Frank's third DPT vaccination and the onset of his problems....

It is a given that medical records are not always accurate. However, in this case I did not find the factual testimony to be sufficiently reliable to conclude that the factual witnesses' current recollection of events is accurate. While Mr. and Mrs. Snyder were specific in their description of Frank's reaction to the December 1957, DPT vaccination and abrupt loss of developmental milestones, I was not convinced that their current recollection as to Frank's reaction and alleged abrupt developmental losses is correct. In addition, while Frank's cousin Mary Louise Melso,

also believes she noticed a change in Frank between December 1957 and January 1958, her testimony was simply not persuasive to me. Indeed, it appears from what records exist that an abrupt change in Frank's demeanor and development was never reported. Rather, his parents noticed his delay as, over time, his developmental lag became increasingly apparent.

*Snyder,* slip op. at 7–8.

▮ In order to prevail in her claim, petitioner must prove by a preponderance of the evidence that Frank suffered an encephalopathy and that the first symptom or manifestation of the encephalopathy occurred within 72 hours. *See* 42 U.S.C. §§ 300aa–13(a)(1)(A), –14(a)I (1994). A special master may not find that a petitioner is entitled to compensation solely on the claims of a petitioner, unsupported by medical records or medical opinion. *Id.* § 13(a)(1). However, the absence of contemporaneous medical records does not automatically foreclose compensation:

The special master or court may find the first symptom or manifestation of onset or significant aggravation of an injury, disability, illness, condition, or death described in a petition occurred within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period. Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset or significant aggravation of the injury, disability, illness, condition, or death described in the petition did in fact occur within the time period described in the Vaccine Injury Table.

*Id.* § 13(b)(2); *see Murphy v. Secretary of DHHS,* 23 Cl.Ct. 726, 733 (1991), *aff'd,* 968 F.2d 1226 (Table), *cert. denied,* 506 U.S. 974, 113 S.Ct. 463, 121 L.Ed.2d 371 (1992).

Petitioner bears a difficult burden in this case. Frank received the vaccination in question on December 30, 1957, nearly 40 years ago. The records of Dr. Budzynski, the physician who administered the third DPT vaccine, and Dr. Eichman, Frank's pe-

diatrician, are nowhere to be found. Consequently, petitioner cannot prove her case with contemporaneous medical records. Absent contemporaneous medical records, the lay factual testimony offered to prove that Frank suffered an on-table injury takes on increased importance, for it is the only vehicle for reconstructing events of the distant past.

Both petitioner and Mr. Snyder testified that Frank abruptly lost his developmental milestones after receiving the third DPT vaccination on December 30, 1957. Both parents also testified that Frank never regained his "alertness" after the third vaccination, but the numerous medical histories taken during Frank's life do not record a reference to Frank's loss of developmental milestones. To the contrary, the medical records from an evaluation performed at the Psycho-educational Clinic of Marywood College on November 11, 1961, state:

> Mrs. Snyder could remember no pre-peri- & post natal problems Frank may have experienced. Numerous baby pictures showed him to be bright and alert as an infant. Some developmental delay was noted from the age of 2 years of age through preschool age. It was not until Frank entered the public school system that his mental retardation became more evident to the family. There is no history of serious illness, accidents, or seizures; nor have there ever been any behavior difficulties. He has no allergies, and his hearing and vision are good.

*Snyder*, slip op. at 5 (quoting PX 20 at 29). Similarly, a February 1, 1987 record of admission from Warminster Hospital notes that Frank had a "negative past medical history." *See Snyder*, slip op. at 5, 7.

4. Along similar lines, petitioner argues that "[t]he concept of fallibility of the medical/scientific community is relatively new and the Snyders testimony must be evaluated within the context of the social environment of 1957 through 1965, not by the standards which one would apply to an informed medical consumer of today." Pet's Br. filed July 19, 1996, at 20. By this argument petitioner suggests that the special master denied petitioner's claim because Frank's doctor did not recognize, in 1957, a causal relationship between Frank's loss of developmental milestones and the third DPT vaccination. The record reveals that

Petitioner argues that the special master penalized petitioner for the dearth of available medical records. While the absence of contemporaneous medical records certainly made petitioner's burden more difficult, the record demonstrates that the special master was sensitive to this circumstance. *See Snyder*, slip op. at 7. The special master did not deny petitioner's claim because the pertinent medical records had been destroyed.[4] Rather, the special master denied petitioner's claim because the records that exist do not reference Frank's sudden loss of developmental milestones after the December 30, 1957 DPT vaccination. The special master apparently reasoned that, if Frank had suffered such losses immediately following the vaccination, it was more likely than not that this traumatic event, or his parents' mention of it, would have been noted by at least one of the medical professionals who evaluated Frank during his life to date. Finding Frank's medical history silent on his loss of developmental milestones, the special master questioned petitioner's memory of the events, not her sincerity. *Snyder*, slip op. at 7–8.

■ The special master occupies a unique position in evaluating the proffered testimony, and the court must review the special master's credibility determinations with deference. The Federal Circuit has described credibility determinations of a special master as "virtually unreviewable." *Bradley v. Secretary of DHHS*, 991 F.2d 1570, 1575 (Fed. Cir.1993); *Phillips v. Secretary of DHHS*, 988 F.2d 111, 112 (Fed.Cir.1993); *see Burns v. Secretary of DHHS*, 3 F.3d 415, 417 (Fed. Cir.1993) ("Such a determination of credibility is uniquely within the purview of the special master.").

this is not the case. Although petitioner raises a valid point concerning the relatively new scientific understanding of vaccine related injuries, the special master denied petitioners claim because none of Frank's medical records mention his loss of developmental milestones. While the special master did not expect the medical records to pinpoint the third DPT vaccine as the cause of Frank's problems, she did expect the medical records to at least document the severe health problems about which petitioner now testifies. *See Snyder*, slip op. at 7–8.

The Court of Federal Claims and the Federal Circuit have considered a case similar to the case at bar. *See Bradley v. Secretary of DHHS*, 24 Cl.Ct. 641 (1991), *aff'd*, 991 F.2d 1570 (Fed.Cir.1993). The petitioners in *Bradley* challenged the special master's finding that their testimony was not credible and did not establish by a preponderance of the evidence that their child had suffered an on-table injury. The mother testified that her child had suffered a reaction to a DPT vaccination similar to that of Frank Snyder: high temperature, loss of muscle tone, staring episodes, and fitful sleep. As Mr. and Mrs. Snyder, the mother in *Bradley* testified that she had telephoned the child's physician immediately after the adverse reaction began, but no available medical or other records substantiated her testimony. In affirming the special master's decision to deny the petitioners' claim, Judge Wiese explained:

> In this case, the special master was not persuaded by Mrs. Bradley's testimony. Her own belief in the truth of the events she recounted was not the point questioned. Rather, it was the accuracy of her recollection that the special master had difficulty with. What chiefly prompted the special master's concern was the absence of any contemporaneous recordation in Rachel's medical records of the events which Mrs. Bradley's testimony described. Those events, as recounted by Mrs. Bradley, were too dramatic to have gone unrecorded. So at least thought the special master. He said the following in his bench ruling: "[I]f Ms. Bradley had ever given doctors the same description of Rachel's behavior in the three-day period that she now has given to me, a note of that description would be somewhere in the medical records here." ...

> • • • • •

> Was the special master acting within permissible bounds in rejecting Mrs. Bradley's testimony? The answer is yes. Reasonable inferences—meaning such inferences as are born of common experience or are the product of a decision maker's special expertise—are within the rightful province of the decider of fact to make. *Federal Trade Comm'n v. Pacific States Paper Trade Ass'n*, 273 U.S. 52, 63, 47 S.Ct. 255, 258, 71 L.Ed. 534 (1927). Thus, a decision based on such inferences, where those inferences are persuasive in their own right, is a decision based on substantial evidence and therefore cannot be labeled "arbitrary and capricious."

*Bradley*, 24 Cl.Ct. at 644–45 (footnote omitted). In comparable circumstances this court cannot find the special master's credibility determinations arbitrary and capricious.

### 4. *Special master's consideration of the record*

 Petitioner next argues that the special master failed to consider the entire record. Specifically, petitioner claims that the special master did not consider photographs taken in early December, 1957 which show Frank as a healthy baby. The special master need not discuss every item of evidence in the record so long as the decision makes clear that the special master fully considered a party's position and arguments on point. *Murphy*, 23 Cl.Ct. at 734 n. 8. In the case at bar, the special master considered and accepted the petitioner's testimony that Frank was initially a healthy baby. The photographic evidence was introduced to reinforce this very point. What the special master did not accept was petitioner's claim that Frank suffered an encephalopathy within 72 hours of the third DPT vaccination. In this manner the record demonstrates that the special master considered the photographic evidence offered by petitioner, showing Frank prior to the vaccination in question, but did not find it probative of the onset of an encephalopathy. The special master did not err in failing to address the photographic evidence in her opinion.

Finally, the court recognizes the underlying principle of the Act as set forth in the House of Representatives Report: "The Federal government has the responsibility to ensure ... that all children who are injured by vaccines have access to sufficient compensation for their injuries." H.R.Rep. No. 908, 99th Cong., 2d Sess. 5, *reprinted in* 1986 U.S.C.C.A.N. 6287, 6346. Congress, however, stipulated the qualifications for compensa-

tion under the Act, thereby demarcating those persons deemed not injured by vaccines.[5] Sympathy is extended to those parents, such as petitioner, with children suffering grievously, but whom Congress chose to exclude from the Act's coverage. In concluding that petitioner failed to meet her burden of proof, the special master's decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### CONCLUSION

Accordingly, based on the foregoing, the decision of the special master is sustained. The Clerk of the Court shall enter judgment dismissing the petition.

**IT IS SO ORDERED.**

No costs on review.

---

5. All other arguments made by petitioner that are not discussed specifically have been considered carefully and found to be without merit.