Sharon A. SKINNER and Michael W. Skinner, as Legal Representatives of Sharnise Skinner, a minor, Petitioners,

v.

SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 90–915V.

United States Court of Federal Claims.

Feb. 2, 1994.

Oldric J. LaBell, Jr., Newport News, VA, attorney of record, for petitioners.

Richard A. Schollmann, Washington, DC, with whom was Asst. Atty. Gen., Frank W. Huber, for respondent.

## ORDER

HARKINS, Senior Judge.

Petitioners, the parents of Sharnise Skinner, seek review in the United States Court of Federal Claims under the National Childhood Vaccine Injury Compensation Program (the Program) of a special master's decision, unpublished, filed August 25, 1993. The special master determined that petitioners have failed to demonstrate entitlement to an award under the Program.

The Program was established in 1986 as part of the National Childhood Vaccine Injury Act, Pub.L. No. 99–660, tit. III, § 311(a), 100 Stat. 3758. Amendments in 1987, 1988, 1989, 1990, and 1991 changed substantially procedures applicable to the functions of special masters, and review of decisions of special masters. Provisions governing the Program, as amended, are contained in 42 U.S.C. §§ 300aa–10 through 300aa–34 (1988 & Supp. III 1991).[1] For convenience, further reference to the Program in this order will

---

1. On Oct. 29, 1992, the United States Claims Court was renamed the United States Court of Federal Claims, pursuant to Title IX, Section 902 of the Federal Courts Administration Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506 (1992).

be to the relevant subsection of "42 U.S.C. § 300aa–___."[2]

Sharnise Skinner was born October 1, 1984, following a normal pregnancy. Her early development was normal and she received DPT (diphtheria-pertussis-tetanus) immunizations on November 27, 1984 (age 7 weeks), and January 31, 1985 (age 4 months), without incident. The third DPT immunization was administered on April 17, 1985, in the office of her pediatrician. There is a conflict in the record as to the course of her development during the period April 17, 1985, to August 14, 1985. The contemporaneous medical records conflict with the testimony of her parents and family friends about when, and to what extent, a change in her behavior after the vaccination was first manifest.

By August 14, 1985, Sharnise had lost some previously acquired skills and had developed some hard neurological signs. The pediatrician recorded that Sharnise was "developmentally delayed" and commenced a schedule of extensive neurological testing. Ultimately, the medical specialists concluded that she was suffering from a significant brain disorder. As of July 1991, Sharnise was unable to sit, roll over, or stand, had almost no vocabulary, and was spastic in all four extremities. A definite cause for her severe problems has not been identified.

In the Program, after there has been a showing of basic factual requirements, a special master may award compensation when the record as a whole establishes a link, either temporal or causal, between a vaccination and the injury, and a preponderance of the evidence does not establish that the injury was due to factors unrelated to the administration of the vaccine. Section 13(a). Where injury results from a vaccine listed on the Vaccine Injury Table (Section 14), within the time period specified, the injury is presumed to have been caused by the vaccination. If the injury is not a Table Injury, compensation may be awarded on a showing

that the injury in fact was caused by the vaccination. Section 11(c)(1)(C).

In this case, petitioners allege Sharnise manifested the first symptoms of an encephalopathy, a listed injury, within 3 days of the DPT vaccination on April 17, 1985. Petitioners primary focus was to show an occurrence of a Table Injury. Alternatively, petitioners contend that the developmental decline and severe problems in fact were caused by the third DPT immunization. The special master concluded that petitioners failed to demonstrate entitlement to an award either as a Table Injury or by causation-in-fact.

The special master's conclusion rests on a novel procedure in which evidence is examined in two stages. This procedure was described by the special master as follows:

> In every Program case, after reviewing the allegations of fact and the most pertinent medical records, the procedure for resolving the particular case is discussed with both counsel, at a status conference conducted pursuant to Rule 5 of the Vaccine Rules of the Office of Special Masters. In appropriate cases, special masters have elected, usually with approval of the parties, to conduct an initial evidentiary hearing at which the petitioner puts forth a presentation as to what symptoms were displayed by the vaccinated individual at the time in question—*i.e.*, the "lay" or non-expert witnesses—in order to determine first whether petitioner's version of events can be credited on those points unsupported by or contradicted by the medical records. At this hearing, the petitioner's expert may or may not also be presented, for the purpose of clarifying *which* alleged factual occurrences are crucial to the expert's diagnosis.

> Obviously, two different outcomes can result from such an initial hearing. On the one hand, if the petitioner is *successful* in convincing the special master of the validity of petitioner's version of events, but opposing medical experts *interpret* those

---

**2.** The Health Insurance, Health Promotion, and Vaccine Injury Compensation Amendments of 1991, Pub.L. No. 102–168, 105 Stat. 1102 (Nov. 26, 1991) amended Section 12(g)(2) which requires notice to a petitioner when the Court of

Federal Claims fails to enter a judgment on a petition within 420 days, exclusive of suspension and remand periods. This order constitutes notice to petitioners pursuant to Section 12(g)(2), as amended.

events differently, then it may be necessary to hold a second evidentiary hearing to take the testimony of the opposing experts.

On the other hand, if the petitioner is unsuccessful, as in this case, in convincing the special master that the crucial symptoms were displayed, or first displayed, during the time period in question, then the case is finally resolved at that point.

The special master's 18–page decision includes in-depth discussions of the legislative background for the Program, problems that have arisen in Program administration, and the special procedure that has been developed and which was utilized in this case. This review is limited to the facts and law that apply to the eligibility of Sharnise Skinner for compensation under the Program. Materials in the special master's decision relative to concepts of congressional intent, Program history, and problems of Program administration are not necessarily accepted nor rejected, and they are not ruled upon.

The special master held an evidentiary hearing on August 10, 1993. At that hearing, the record included relevant medical records, a March 15, 1993 medical report by petitioners' expert (Dr. Kinsbourne), a medical report of Dr. Svindor Toor filed by petitioners on June 14, 1993, a medical report of Dr. Spiro submitted by respondent on May 29, 1991, and affidavits signed by petitioners, Hazel Ruff and Sharnise Cooper.

The hearing was limited to testimony from lay witnesses to determine if, as a preliminary factual matter, their testimony established by a preponderance of the evidence that Sharnise experienced the abrupt onset of developmental delay and related symptoms in the days immediately following her DPT vaccination. The special master took the testimony of petitioners and three of their family friends. Petitioners testified that Sharnise abruptly changed the day after the April 17, 1985, DPT vaccination. According to the lay testimony, Sharnise lost many of her developmental "milestones," including the ability to reach for toys, make sounds, "scoot" on her stomach, lift her head, or follow objects with her eyes.

The special master considered the affidavit of a fourth family friend, Mrs. Sharnise Cooper. At the close of the hearing, petitioners' counsel requested that the hearing be continued until an unspecified future date to take the live testimony of Mrs. Cooper. The special master initially took petitioners' request under advisement, but in the decision, after further consideration, denied it. He stated he would have heard Mrs. Cooper's testimony had she been available on the scheduled hearing date. The special master stated that the cumulative testimony of one more family friend would not make any difference in his view, and that the inferences to be drawn from the medical records "strongly outweigh the testimony of family members and friends given years later."

The special master found that the lay witnesses' testimony was not particularly reliable, or accurate, and that it was in conflict with contemporaneous medical records. The medical records tended to place the onset of the developmental delay as occurring one month or more after the vaccination.

In evaluating petitioners' evidence, the special master provided an exhaustive recitation of the evidence on the "timing of onset" issue. Of particular relevance was the routine pediatric visit 3 weeks after Sharnise's DPT vaccination and Sharnise's first visit with a pediatric neurologist in September 1985. Petitioners' testimony at the hearing contrasted to the medical history they had provided to Sharnise's pediatrician. The medical record noted only a problem with Sharnise's weight and did not mention any abrupt or devastating loss of milestones. The special master gave particular weight to the medical record made after a visit on September 11, 1985, by the first neurologist to see Sharnise. The neurologist recorded that:

For one day following [her third DPT] shot, Sharnise had low grade fever and was irritable. Otherwise, she seemed to be normal and she did not sleep excessively. Mrs. Skinner is concerned that Sharnise's development appeared to slow down or regress following the DPT shot. She first became aware of this developmental problem at around 8 months of age, ap-

proximately one month following the DPT shot.

The special master found that the history taken by the first neurologist "fits in" with other notations in the record.

Petitioners' expert, Dr. Kinsbourne, in his medical report based his conclusion that Sharnise's developmental delay was a static encephalopathy, rather than a progressive degenerative neurological disorder, on the validity of the petitioners' assertion that the first symptoms were an abrupt loss of skills within 72 hours of the vaccination. The special master did not accept as accurate the factual scenario upon which petitioners' expert based his opinion. The special master stated:

> Thus, Dr. Kinsbourne's opinion, based upon the assumption of the accuracy of that scenario, is of no support to petitioners' case here. In this record, I reiterate that the key finding is that I could *not* conclude that any abrupt loss of developmental milestones occurred within three days after the inoculation. And there is no doubt that the absence of such a finding renders Dr. Kinsbourne's opinion valueless to petitioners.

The assumption on which Dr. Kinsbourne's opinion was based also prevented its usefulness on the causation-in-fact issue. The special master's decision states:

> It is clear in this case that the petitioners are not able to carry their burden as to "causation-in-fact." That is because the validity of the opinion that Dr. Kinsbourne expressed on "causation" was ruined, just as was the case with respect to the "Table injury" issue, by the fact that the expert was clearly laboring under a mistaken factual assumption, as to whether an abrupt loss of developmental milestones was in fact exhibited during the three-day period following the DPT shot. And this mistaken assumption clearly was critical to the validity of the "causation" opinion expressed.

In the motion for review, petitioners listed the following objections to the special master's decision:

1. The Special Master relied on matters not in evidence or in the case record concerning inferences about the opinion of Dr. Kinsbourne.

2. The Special Master erred in failing to allow the claimants to produce the testimony of Sharnise Cooper.

3. The Special Master erred by rendering decision prior to hearing the testimony of Dr. Kinsbourne, the claimants expert.

4. The Special Master erred in requiring proof of a loss of milestones within 3 days of the inoculation instead of merely the first symptoms within 3 days and continuous connection until the injury occurred under 42 U.S.C. 300aa–11.

5. The decision of the Special Master was contrary to the evidence, and attached excessive weight to parts of the medical record.

Petitioners' objections involve three issues: (a) the failure of the record to include testimony of Dr. Kinsbourne and Mrs. Sharnise Copper (Nos. 2 and 3), (b) weight accorded medical records when lay witness testimony is contradictory (Nos. 4 and 5), and (c) reliance on matters not in evidence (No. 1).

---

Petitioners' objections reflect a misunderstanding of the role of the special masters in the Program. The Program is a novel proceeding in the Judicial Branch, and the responsibilities and functions of special masters in the Program's amended procedures are unique. The 1989 Amendments established a separate office of special masters within the Court of Federal Claims, administered by a chief special master, and gave that office special authority and considerable administrative independence in decisions on claims for compensation under the Program. Section 12(c). The 1989 Amendments directed promulgation of separate rules for special masters, and established specific criteria the rules were to contain (Section 12(d)(2)). Standards were established for conduct of proceedings on a petition (Section 12(d)(3)(B)).

■ Review of a special master's decision by the Court of Federal Claims is expected to be an exceptional occurrence rather than a

routine procedure. The report of the Conference Committee on the 1989 Amendments emphasized that an appeal to the Court of Federal Claims was to be "under very limited circumstances." The report states:

The Conferees have provided for a limited standard for appeal from the master's decision and do not intend that this procedure be used frequently but rather in those cases in which a truly arbitrary decision has been made.

H.R. Conf.Rep. No. 386, 101st Cong., 1st Sess. at 517, *reprinted in* 1989 U.S.C.C.A.N. 1906, 3112, 3120.

■ Review of a special master's decision in the Court of Federal Claims is of a very limited nature. This court may not set aside any findings of fact or any conclusion of law of the special master unless such findings of fact or conclusion of law are "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Section 12(e)(2)(B). In the absence of such findings, this court either must uphold the findings of fact and conclusions of law and sustain the decision or remand the petition to the special master for further action in accordance with the court's directions. Sections 12(e)(2)(A) and (C).

■ This limited scope of review is tailored to the concepts and objectives of the Program. The standard "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" is based on one of the criteria established by the Administrative Procedure Act (APA). 5 U.S.C. § 706 (1988). To the extent consistent with Program objectives to be attained through the Office of Special Masters, decisions interpreting the APA standard have application in a review of a special master's decision. Under the APA standard, conclusions of law are considered de novo. *Rice v. Wilcox,* 630 F.2d 586, 589 (8th Cir.1980). On issues of law, however, the Program standard of review requires recognition be given to the special master's expertise in the development of the procedures in this novel Program. A decision on issues of law applicable to the Program should be overturned only when error is unmistakenly clear. The standard applicable to a review of a special master's findings of fact does not differ from the standard applicable to a review of a special master's conclusions of law. In a review in this court under the Program, questions of law are not reviewed de novo. A de novo review would be contrary to the language of the statute, and would put an erroneous gloss on the standard established in Section 12(e)(2)(B). When this court reviews a special master's decision, the standard of review for both conclusions of law and for findings of fact is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

■ The "arbitrary and capricious" test in Section 12(e)(2)(B) is a highly deferential standard of review. "If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Secretary of the Dep't of Health & Human Servs.,* 940 F.2d 1518, 1528 (Fed.Cir.1991).

■ The Court of Federal Claims may not substitute its own judgment for that of the special master. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413–16, 91 S.Ct. 814, 822–24, 28 L.Ed.2d 136 (1971). The special master's decision must articulate a rational connection between the facts found and the choice made. *See Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). "Arbitrary and capricious" includes decisions where the special master has relied on factors which Congress has not intended to be considered, or has entirely failed to consider an important aspect of the problem, or has offered an explanation of the decision that runs counter to the evidence, or is so implausible it could not be ascribed to a difference in view or a product of expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983).

In *Munn,* the Federal Circuit explicitly defined the standard to be employed when a special master's conclusions of law and findings of fact are reviewed:

When a case comes before us in which the Claims Court has upheld the findings and conclusions of the special master against a charge that they were arbitrary and capricious, and the Claims Court has rendered judgment accordingly, it follows that the Claims Court's judgment is entitled to at least the same deference by us as that accorded the special master by the Claims Court. That is, we may not disturb the judgment of the Claims Court unless we find that judgment to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

*Munn v. Secretary of the Dep't of Health & Human Servs.,* 970 F.2d 863, 870 (Fed.Cir. 1992); *see also id.* at 871 n. 11.

(a) Failure to Include Testimony

▮▮▮ In the Program, a special master is not required to allow every proposed witness to testify. The statute obligates a special master to "afford all interested persons an opportunity to submit written relevant information." Section 12(d)(3)(B)(iv). The statute directs that the Vaccine Rules shall "include the opportunity for parties to submit arguments and evidence on the record without requiring routine use of oral presentations, cross-examinations, or hearings." Section 12(d)(2)(D). The Vaccine Rules accord the special master wide latitude in the receipt of evidence, governed by principles of fundamental fairness to both parties. In receiving evidence, the special master will not be bound by common law or statutory rules of evidence. The special master will consider all relevant, reliable evidence. Evidence may be taken in the form of documents, affidavits, oral testimony at a hearing in person or via telephone; or even, in appropriate circumstances, video tape. Sworn written testimony may be submitted in lieu of oral testimony. Vaccine Rule 8(b). A case may be decided on the basis of written filings without an evidentiary hearing. Vaccine Rule 8(d).

Mrs. Sharnise Cooper's affidavit was before the special master, and the decision shows clearly it was considered. Petitioners do not make a proffer that her testimony would be anything other than that contained in the affidavit.

Similarly, the special master had before him the medical report of Dr. Kinsbourne. The decision discusses in detail the factors which determined the special master's assessments of its value as evidence on petitioners' claim. Testimony from Dr. Kinsbourne would not contribute additional information to the factors considered by the special master. Further, Dr. Kinsbourne's medical report, by its terms, specifically states his conclusion that the injury was a pertussis vaccine encephalopathy was based on the parents' account that the milestones were lost abruptly. In sum, the refusal to receive testimony from Mrs. Cooper and Dr. Kinsbourne was not error.

(b) Weight Accorded Medical Records Contradicted by Testimony of Lay Witnesses

▮▮▮ The statute prohibits an award of compensation based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion. Section 13(a)(1). The statute also provides that a special master is not bound by medical records and medical opinion, and that a special master could find that an injury occurred within the vaccine injury Table time period even though the occurrence of symptoms or manifestations of the injury was not recorded in the medical records or was incorrectly recorded as having occurred outside the Table period. Section 13(b)(1) and (b)(2).

▮▮▮ This case involves a factual context wherein claims of the petitioners contradict an injury onset date that is unambiguously recorded in medical records. No credible theory is presented to explain why the medical records would be so inaccurate. In such a situation, the special master must closely examine the testimony of petitioners' witnesses, and weigh it against the strength of the contradicting medical records. The special master defined the issue as follows:

Thus, it is clear that the initial key question before me relates to the accuracy of that lay witness testimony. If I view that testimony as accurate, then I would need to closely consider the validity of Dr. Kinsbourne's medical analysis of the described symptoms, and weigh that against the contrary conclusion of respondent's ex-

pert, Dr. Spiro. However, if, on the other hand, I conclude that the lay witness testimony is not accurate, then petitioners have clearly failed to make a case for an award, since Dr. Kinsbourne's opinion is based upon that testimony.

On the basis of the entire record, the special master could not conclude that the lay witness testimony was accurate on the key point of when Sharnise lost her developmental milestones. He could not find it more probable than not that the loss was abrupt and injury manifestations occurred within 3 days of the April 17, 1985, vaccination.

In general, contemporaneous written records are to be given more weight. than testimony adduced years later. Oral testimony that is in conflict with contemporaneous documents is entitled to little evidentiary weight. *See e.g., United States v. United States Gypsum Co.,* 333 U.S. 364, 396, 68 S.Ct. 525, 92 L.Ed. 746 (1947); *Montgomery Coca–Cola Bottling Co. v. United States,* 222 Ct.Cl. 356, 615 F.2d 1318, 1328 (1980); *Murphy v. Secretary of the Dep't of Health & Human Servs.,* 23 Cl.Ct. 726, 733 (1991), *aff'd,* 968 F.2d 1226 (Fed.Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 463, 121 L.Ed.2d 371 (1992); *Reusser v. Secretary of the Dep't of Health & Human Servs.,* 28 Fed.Cl. 516, 523 (1993).

A special master has an obligation to minimize the cost and complexity of Program proceedings. The two stage procedure used by the special master does not constitute error on the facts of this case. The special master's conclusion as to the time of injury onset is not shown to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

(c) Reliance on Matters not in Evidence

Petitioners assert the special master erred in relying on evidence received in other cases to draw conclusions as to Dr. Kinsbourne's opinion in this case. The special master had acquired familiarity from other cases with Dr. Kinsbourne's position as to symptoms that are sufficient to evidence an encephalopathy from other cases. Dr. Kinsbourne had testified before the special master in numer-

ous Program cases. On the basis of this past experience, the special master observed that "it is clear to me that Dr. Kinsbourne would not opine that an 'encephalopathy' had occurred based on those symptoms [irritability and increased sleepiness] alone."

It is not necessary to determine whether such reference to other Program cases is error. In the context of the relaxed formality that applies to Program proceedings, it is to be expected that the special masters would become familiar with the position of medical expert witnesses who frequently appear and testify on injuries that warrant compensation.

In this case, even if such reference were considered to be error, it would be de minimis. Dr. Kinsbourne's report specifically affirms that his opinion was based on the parents' account of the facts. The special master noted:

Further, in this case, he very pointedly stated his opinion as follows (see his letter filed on June 14, 1993, p. 2, emphasis added):

*Basing myself on the parents' account that the milestones were lost abruptly,* it is my opinion to a reasonable degree of medical certainty that Sharnise suffered a pertussis vaccine encephalopathy.

This clearly indicates that, in this case, as in other cases, he could *not* base an opinion upon the mere irritability and sleepiness alone. Note also that in the sentence immediately preceding the sentence quoted above, Dr. Kinsbourne indicates that his opinion would be *different* if Sharnise's loss of milestones were, as I have in fact concluded, gradual rather than abrupt.

On the basis of the record in this case, and on the foregoing discussion, petitioners have not shown that the special master's findings of fact and conclusions of law are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. Accordingly, the findings of fact and conclusions of law of the special master applicable to petitioners' claim are upheld and the decision is sustained. The Clerk is directed to enter

judgment in accordance with the special master's decision.