Harold and Debhi **SWORD**, Individually and as Parents and Legal Representatives of Natalie Sword, their Infant Daughter, Petitioners,

v.

The **UNITED STATES**, Respondent.

No. 90–1491V.

United States Court of Federal Claims.

June 10, 1999.

Ronald Craig Homer, Boston, MA, for petitioners.

Glenn A. MacLeod, Washington, D.C., for respondent.

## OPINION

BASKIR, Judge.

This case arises under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. § 300aa–1 *et seq.* (West Supp.1997), as amended (the Vaccine Act). The case is before the Court pursuant to Appendix J of the rules of this Court on Defendant's Motion for Review of the Special Master's decision of December 29, 1998, awarding compensation to Petitioners for the vaccine-related death of their daughter.

The Government has raised four objections: First, that the Special Master's decision is not supported by the factual record, insofar as it is based on a medical explanation not offered by any of the expert witnesses; second, that the Government was wrongfully denied the opportunity to present evidence rebutting the Special Master's medical explanation; third, that the Special Master failed to apply the proper legal standards for causation; and finally, that the Special Master's alternative findings of encephalopathy and significant aggravation are arbitrary and capricious. After examining briefs and hearing oral argument, we reject the Government's petition and affirm the Special Master's decision.

## BACKGROUND

Petitioners' daughter, Natalie Sword, was born on February 13, 1975. She received her first Diphtheria–Pertussis–Tetanus (DPT) vaccination at two months of age. That vaccination resulted in no apparent adverse reactions. The claim stems from the second DPT vaccination approximately five weeks later. Before the vaccination, she was examined by a physician who noted that the infant laughed and babbled. His examination revealed she had a small cough and was developing a chest problem but found her lungs were clear.

Natalie was vaccinated at approximately 10:30 a.m. She immediately started crying, drank some of her formula, and fell asleep. She never again awoke despite a number of attempts by her parents to feed her. Natalie did not respond to her bottle or to ice cream which her father had put to her mouth. Within four hours of the vaccination she was dead.

The evidence presented at the hearing included Natalie's medical records, the report of autopsy, and testimony from the Petitioners, and from Dr. Marcel Kinsbourne and Dr. John J. Shane on their behalf. The Government offered the expert opinions of Dr. Russell D. Snyder, Dr. Lester S. Adelman, and Dr. Virginia M. Anderson.

In a lengthy decision, the Special Master summarized and evaluated all of the evidence presented, which we now paraphrase:

Dr. Kinsbourne, a pediatric neurologist, concluded that Natalie suffered an on-Table encephalopathy resulting in her death. He also countered Respondent's expert, Dr. Anderson, who felt that Natalie suffered from congenital cystic adenomatoid malformation (CCAM), a condition that causes lesions on the lungs which in turn entrap carbon dioxide. While Dr. Kinsbourne agreed that Natalie had CCAM, he maintained that the DPT caused her death. He based his

opinion upon the depth of Natalie's non-responsitivity so soon after the vaccination.

Dr. Shane, a forensic neuropathologist, also testified that Natalie's death resulted from DPT-encephalopathy. He was persuaded by classic indications of encephalopathy and lack of CCAM symptomology noted by Dr. William Cox, a pathologist who had formerly been retained by Petitioners. Like Dr. Kinsbourne, Dr. Shane conceded that the CCAM condition existed, but maintained it did not cause Natalie's death.

Dr. Adelman, on the other hand, testified for Respondent that Natalie suffered from a form of a bacterial lung infection. At the hearing, Dr. Adelman stopped short of concluding that the infection caused the child's death, choosing to defer to Dr. Anderson's opinion.

The Special Master found that Dr. Anderson attributed Natalie's death solely to her CCAM condition, although as we shall see, Dr. Anderson's testimony was not that unequivocal. Dr. Anderson admitted that the DPT vaccination may have initiated Natalie's somnolence, but believed the DPT vaccine was unrelated to Natalie's death. We shall return to Dr. Anderson's testimony.

Dr. Snyder also testified for Respondent. He did not believe Natalie had an acute encephalopathy after the vaccination, due to the lack of symptoms other than drowsiness. Principally relying upon Dr. Anderson's report, Dr. Snyder attributed Natalie's death to some sort of pulmonary difficulty, but was unaware of the condition known as CCAM.

Despite the divergence in the opinions of Petitioners' and Respondent's experts, all generally agreed that it was not Sudden Infant Death Syndrome that caused Natalie's death, as the 1975 autopsy reported.

The documentary evidence also conflicted. The two-decades-old autopsy noted a lesion on the lungs but concluded that it was due to over-aggressive pulmonary resuscitation. Dr. Anderson noted the lesion is consistent with her theory of a CCAM. On the other hand, this lesion affected only part of one lung. Natalie's medical record, including the notes of her pediatrician who had examined her and found that her chest was clear, support Kinsbourne's opinion that CCAM did not cause the infant's death. However, as the Special Master noted, the record indicates that Natalie was suffering from a cough the day she was administered the vaccination, a factor which could point toward some pulmonary difficulties, perhaps attributable to the CCAM.

## FINDINGS OF THE SPECIAL MASTER

The Special Master found that the Swords' expert witnesses and their description of Natalie's extreme somnolence following the DPT inoculation support a finding of on-Table encephalopathy caused by the vaccination.

Although not argued by Petitioners at the hearing, the Special Master also concluded that the Swords' were entitled to judgment on the alternative theories of causation in fact and significant aggravation of a subclinical disease leading to death. In fact, the Special Master found that Petitioners' burden of demonstrating causation in fact was actually established by Respondent's witnesses, primarily Dr. Anderson.

The Special Master found that "[t]he scenario that seems most likely ... is that Natalie experienced drowsiness, a typical response to DPT, and because of her underlying CCAM, she could not recover from her DPT-induced drowsiness because of insufficient reserve of air and died." *Sword v. Secretary of Health and Human Services,* 1998 WL 957201, *10 at n. 5 (Fed.Cl. Spec. Master December 29, 1998).

Noting her authority to adopt practices that are "flexible and informal," the Special Master effectively merged the theories of opposing parties, and provided an alternative conclusion not offered by either party. Anticipating Respondent's objection, the Special Master cited the legislative purpose of the Vaccine Act to make awards to "vaccine-injured persons quickly, easily, and with certainty and generosity." *Id.* In the following pages, we will refer to this finding as the "Special Master's explanation" or the "merged causation theory" or appropriate synonyms.

The Government objected to the findings, filing a petition for reconsideration with proffers of expert testimony rebutting the theory espoused by the Special Master. The petition and proffers were rejected by the Special Master. On review, the Government again proffers the excluded evidence, now in the form of affidavits.

## DISCUSSION

The Vaccine Act, of course, has provided a system that avoids many of the questions of causation typical of tort claims. The Government's attack on the conclusion and the results of the proceedings below implicate the role of the Special Master's differing functions and the respective standards of review applicable in each instance.

Respondent takes issue with the Special Master's three alternate findings regarding on-Table encephalopathy, causation in fact and significant aggravation of the CCAM. On a more fundamental level, the Government claims that the Special Master could not legally adopt a medical explanation not espoused by an expert witness. Its claim of unfair surprise also raises fundamental issues.

We will first discuss the Government's attack on the findings, and then address the question of procedural unfairness.

### Review of Findings

■ The Special Master's findings of fact and application of those facts to law are reviewed by this Court under an arbitrary and capricious standard. *See Munn v. Secretary of Department of Health and Human Services,* 21 Cl.Ct. 345, 347–48, *aff'd,* 970 F.2d 863 (Fed.Cir.1992); *Mills v. Secretary of Department of Health and Human Service,* 27 Fed.Cl. 573, 576 (1993); and 42 U.S.C. § 300aa–12(e)(2)(B). This Court will not reverse a decision of the Special Master unless the Special Master failed to consider relevant evidence, drew implausible inferences, or failed to state a rational basis for her decision. *Gurr v. Secretary of Health and Human Services,* 37 Fed.Cl. 314, 317 (1997), citing *Hines v. Secretary of Department of Health and Human Services,* 940 F.2d 1518, 1528 (Fed.Cir.1991).

### On–Table Encephalopathy

■ The Special Master does not dedicate a substantial portion of her decision to her ruling that Petitioners met their burden of establishing on-Table encephalopathy under 42 U.S.C. § 300aa–14(b). Instead, she dedicates the majority of her opinion to an analysis of the combined effect of DPT and CCAM. Apparently, she recognized the fact that the on-Table finding might be prone to attack since the symptoms exhibited—crying and drowsiness—are typical reactions to DPT vaccinations. Indeed, she introduces her alternative on-Table finding by first stating she would not make that finding, and then, equally curiously, follows with the statement that the on-Table conclusion is somehow triggered by a possible Government appeal of her merged-cause finding:

> The court need not determine whether or not Natalie's stupor was an on-Table encephalopathy in light of its holding that DPT caused her somnolence which led to her death because of her underlying pulmonary vulnerability due to CCAM. However, if respondent chooses to appeal that holding, the undersigned holds in the alternative that she did have an on-Table encephalopathy . . .

We will not try to unravel this syntax. Nevertheless, we agree with the Special Master's assessment that Natalie's somnolence far exceeded that commonly associated with administration of DPT. This finding enjoys ample support in the record, to include Mr. Sword's testimony that Natalie did not awake even when he put cold ice cream in her mouth on the way home from the hospital, Mrs. Sword's account of Natalie's refusal to stir when speaking to her and changing her clothes, and corroborating medical record entries of Natalie's pediatrician upon their reporting this information. In addition, Dr. Kinsbourne and Dr. Shane offered expert opinion supporting this conclusion.

### The Special Master's Alternative Theories

Although the Special Master found that Petitioner satisfied its burden of demonstrating an on-Table encephalopathy, she found

the combined effect of DPT and CCAM the most plausible explanation for Natalie's sudden death. In reviewing this finding, we look more specifically at the expert witnesses and their testimony.

For the Petitioner, Dr. Shane offered no comprehensive explanation. Dr. Kinsbourne focused solely on the explanation that the DPT vaccine caused encephalopathy. He discounted the evidence that CCAM may have played a role in the death.

For the Government, Dr. Anderson attributed Natalie's death solely to the CCAM, but failed to account for her progressively deep somnolence following the vaccination. She also failed to account for the fact that the CCAM was restricted to a portion of one lung. Finally, she failed to explain how the CCAM coincidently and *independently* caused Natalie's death at the time of the DPT vaccination. She offered no step-by-step explanation of how the CCAM condition caused death.

The record offers no persuasive support for the conclusion that CCAM was the sole or even predominant cause of death. During her testimony, Dr. Anderson, the main proponent of the theory, was queried repeatedly about CCAM as the cause of death. Initially, she said that it was "theoretically possible." In other words, she offered CCAM as a candidate cause, but did not commit herself.

The Special Master, recognizing the conjectural nature of Dr. Anderson's testimony, pressed the witness regarding her characterization of CCAM as a "possibility." Dr. Anderson then became somewhat more definite but still did not commit herself: "I think it is more likely than not the cause of death." Although less tentative, Dr. Anderson still was not prepared to state definitively that CCAM was the cause. She did not explain how her estimation had gone from "possible" to "more likely," and she still did not offer an analytical sequence that went from CCAM being present to CCAM being the cause. In the end, Dr. Anderson conceded that CCAM was merely her "interpretation of how [Natalie] *could have died.*" (Emphasis added.)

Dr. Anderson had resolved all her doubts by the time the Special Master issued her decision. In supporting the Government's request for a rehearing, Dr. Anderson for the first time stated conclusively that CCAM and not the vaccine, or some combination, had caused death.

As one reviews the transcript of Dr. Anderson's testimony, one sees vividly the progression of her opinion regarding CCAM. It starts with a tentative statement, then as she is further pressed, it gets more and more definitive. But the record is barren of any explanation for this evolution of her thinking.

Dr. Anderson was, however, quite candid and consistent in another part of her testimony—her inability to offer an explanation for how the CCAM actually caused Natalie's death. She explained that CCAM operates in three ways: spontaneous pneumothorax, manifesting itself in sudden catastrophic death; carbon dioxide narcosis, where air is trapped in the CCAM lesion causing one's carbon dioxide levels rise to intolerable levels; and atelectasis, or collapse of the lung from inadequate aeration. She explained that CCAM could have theoretically caused Natalie's death in one of these three ways, but in the absence of tests, she could not determine which of the three had been the methodology.

Dr. Anderson's inability to explain which of the three very different causative chains applied to Natalie's case is a fatal legal defect. Her assertion that CCAM was the cause of death lacked this critical statutory requisite. For the Government to prevail on its alternative, sole-cause hypothesis, it must show a "logical sequence of cause and effect" from the asserted cause to the death or injury. *Cf. Grant v. Secretary of Dept. of Health and Human Services,* 956 F.2d 1144, 1148 (Fed. Cir.1992). It is not sufficient that the Government merely assert an alternative theory and then rely on the ultimate impact. This burden is also the petitioner's, of course, when establishing their prima facie case for causation in fact. *Shyface v. Secretary of Health and Human Services,* 165 F.3d 1344, 1353 (Fed.Cir.1999) (citing *Grant,* 956 F.2d at 1148). Here Dr. Anderson's explanation was much like that of Dr. Rorke in the *Shyface* case, essentially surmising that Cheyenne Shyface's death was caused by a

massive infection because he died. *Id.* at 1346. We find here, as the special master found in *Shyface,* that this type of testimony amounts to impermissible speculation. *Id.*

Thus, we conclude that the Special Master's rejection of Dr. Anderson's theory that CCAM was the sole cause of death is well supported by the record, and is well within her province as the fact-finder who heard the witnesses. In fact, we would be most uncomfortable had the Special Master come to the opposite conclusion and agreed with Dr Anderson.

On the other hand, this does not mean that CCAM necessarily played no role in the girl's death. For we do have evidence that CCAM was present in a portion of one lung. The Special Master's conclusion that it was not sufficient to cause death by itself, or to be the substantial cause of death, does not exclude the logical possibility that it combined with DPT in causing the tragedy. There is no evidence to raise Natalie's CCAM condition to a substantial or sole cause of death. But the presence of the CCAM condition in light of Dr. Anderson's explanation of what its minimum impact would be, still permits the Special Master to conclude it was a factor in the death (and, as we note at the end of this review, it also satisfies the *Shyface*-required finding).

Respondent's other expert witnesses, Dr. Adelman and Dr. Snyder, did not offer independent opinions that CCAM caused Natalie's death. They expressed doubts that Natalie suffered an encephalopathy resulting from her DPT vaccination, but both ultimately deferred to Dr. Anderson's testimony regarding CCAM.

Dr. Adelman, who admitted that he was "not a lung man," vaguely described the possibility that Natalie suffered from a bacterial infection in her lung. Dr. Snyder, a neurologist, likewise had little information to offer on pulmonary conditions. He had never even heard of CCAM. In fact, although he rejected DPT as a cause of death, Dr. Snyder conceded he did not know what caused the child's death.

The Special Master's explanation, and only her explanation, incorporates all the facts, including the medical facts offered by the doctors, surrounding Natalie's death. The Special Master's conclusion is more than simply supported by the evidence. It is the most intellectually satisfactory explanation of the entire factual record.

As fact-finders, Special Masters, like juries, are often faced with the "battle of the experts" when it comes to interpreting facts. And as fact-finders, they may find that truth lies somewhere in between the opposing, uncompromising views of the partisan experts. Expert opinion testimony is just opinion, and the fact-finder may weigh and assess that opinion in coming to her own conclusions. However, even more than ordinary fact-finders, this Court has recognized the unique ability of Special Masters to adjudge cases in the light of their own acquired specialized knowledge and expertise. *Ultimo v. Secretary of Department of Health and Human Services,* 28 Fed.Cl. 148, 152–53 (1993); see also *Munn v. Secretary of Department of Health and Human Services,* 970 F.2d 863, 871 (Fed.Cir.1992) (special masters accorded status as experts, entitling them to special statutory deference in fact-finding normally reserved for specialized agencies). During oral argument, Counsel for Respondent conceded this point, yet argued that he was unaware of other cases where CCAM was involved. The Special Master's sole professional responsibility for years has been to preside over vaccine cases, including those in which DPT inoculations are linked to encephalopathy.

The fact that Petitioners never explicitly advanced the theory constructed by the Special Master has little bearing on the validity of the findings. No judge or jury can be forced to accept or reject an expert's opinion or a party's theory at face value. To require such a choice in this context is to neglect the Special Master's duty to "vigorously and diligently investigate the factual elements" underlying the petition. *Mills,* 27 Fed.Cl. at 578.

The probative value of expert testimony surfaces *indirectly* in providing specialized knowledge with which the fact-finder may make rational inferences and reconcile the conflicting expert opinions. A fact-finder, es-

pecially one with specialized experience such as a Special Master, can accept or reject opinion testimony, in whole or in part. *Munn,* 21 Cl.Ct. at 350. When the evidence is in, and it is time to apply the facts to the law, the expert's role is over. Partisan testimony then gives way as the Special Master evaluates the testimony in light of the entire record, based on reasonable inferences born of common experience or the product of special expertise. *See Bradley v. Secretary of Department of Health and Human Services,* 24 Cl.Ct. 641, 645 (1991) (citing *Federal Trade Comm'n v. Pacific States Paper Trade Ass'n,* 273 U.S. 52, 47 S.Ct. 255, 71 L.Ed. 534 (1927)). She did so in this case, weighing factors not present in the cold record—credibility and those other intangibles that lead reviewing courts to defer so greatly to the fact-finder who observed the witnesses and heard the evidence.

■ In exercising its jurisdiction pursuant to the Vaccine Act, the Court acts not as a trial court, but as a reviewing authority. *Munn,* 970 F.2d at 869. That role does not lend itself easily to resolving differing accounts of causation or other factual disputes, nor to weighing the credibility and strength of testimony. The Special Master, by contrast, heard all of the evidence first-hand and was afforded the opportunity to question the witnesses and evaluate their credibility and persuasiveness. She was, therefore, best able to steer a course through the divergent opinions in this case.

■ At argument, Respondent's counsel expended much effort to persuade the Court that his experts were more convincing than Petitioner's. His efforts, though most capable, were misdirected. This Court will not disturb the Special Master's reasoned decision, unless it is not supported by the evidence and reasonable inferences drawn from it, or is so lacking in rationality as to be arbitrary and capricious. Respondent has failed to meet that high standard and, therefore, this Court upholds the Special Master's decision.

### Shyface Causation

■ Next, we address Respondent's objection that the Special Master's finding of causation in fact failed to apply the standards set forth by our higher Court in *Shyface v. Secretary of Health and Human Services,* 165 F.3d 1344 (Fed.Cir.1999). In *Shyface,* the Federal Circuit filled a void of precedent regarding non-table causation in Vaccine Act cases. In reviewing causation in a case involving the potential interaction of an E. coli bacterial infection and DPT, the Court held that to establish causation, the petitioner must demonstrate that the vaccine is a "substantial factor" in bringing about the alleged harm, and that the harm would not have occurred but for the vaccine. *Id.* at 1352.

Although the Special Master clearly found that Natalie would not have died "but for" the administration of the DPT vaccination, her decision does not expressly state that the vaccine was a "substantial factor" in the death. According to *Shyface,* in order to make this showing, "there must be a 'logical sequence of cause and effect showing that the vaccination was the reason for the injury.'" *Id.* at 1353 (citing *Grant,* 956 F.2d at 1148).

We note the Special Master cited this very same passage from *Grant* in her analysis of causation in fact. Therefore, although the Special Master failed to enunciate the test of *Shyface* literally, the Court finds that she did apply the correct legal standard to the facts of the case. The Court notes that Federal Circuit's opinion in *Shyface* had not yet been published at the time the Special Master decided the instant case. Had that case been available to the Special Master, the Court is persuaded, based on the entire record, that the results in the case at bar would have been no different. As we stated earlier, we think the logic of the Special Master's findings compel the conclusion that she viewed the DPT vaccine, and not the CCAM, as the predominant factor.

Indeed, were it thought necessary, this Court would—and does—exercise its own fact-finding authority to conclude that the DPT vaccine was a substantial factor in Natalie's death. *See* 42 U.S.C. § 300aa–12(e)(2)(B). We base this finding on the independent on-Table finding, on the consensus that the victim had a CCAM condition,

that the CCAM affected only a portion of one lung, and on the expert opinion that the CCAM was not, itself, sufficiently serious to cause death. Therefore, any error in failing explicitly to apply the test as set out in *Shyface* is harmless.

### Petition for Rehearing, Proffer of Evidence, and Surprise

After the Special Master issued her findings and decision, the Respondent petitioned for reconsideration, proffering the rebuttals of Dr. Anderson and Dr. Adelman to the Special Master's alternate theories. Counsel later presented affidavits of the witnesses to the same effect, and filed them with this Court in an effort, contested by Plaintiff, to supplement the factual record on appeal. On review, Respondent protests that he was surprised by the Special Master's conclusions and had never been afforded the opportunity to address them. He argues that simple justice—if not the statute itself—requires that the Special Master or, failing that, this Court afford him that opportunity.

Respondent argues that there is no place for deference because what is at issue is a question of law, not fact. However, because of the deference accorded fact-finders, this Court will not aid a party who seeks to present additional evidence after his initial effort proves unpersuasive. To do so would sacrifice the legislature's goal of making the proceedings both expeditious and generous toward the claimant. *See* H.R.Rep. No. 908, 99th Cong., 2d Sess. 3 (1986), reprinted in 1986 U.S.Code Cong. & Admin.News 6287, 6344; *see generally*, Vaccine Rules of the Office of the Special Masters of the United States Court of Federal Claims, RCFC, Appendix J (Vaccine Rules).

On a more fundamental level, judicial officers conducting evidentiary hearings—trials—are afforded great latitude on how they administer the proceedings in their forum. *See* Vaccine Rules 3 and 8. That applies to petitions for reconsideration of rulings, and proffers designed to supplement the factual record after the record is closed. We do not review *de novo* a Special Master's denial of respondent's motion for reconsideration and refusal to entertain further expert testimony.

Discretionary determinations such as these are left to the individual tasked with conducting the hearing on the petition. We will not reverse them absent an abuse of discretion. *Munn*, 970 F.2d at 870, n. 10. Although the Special Master did not articulate a reason for her rejection of Respondent's motion, there are at least two—either of which is sufficient.

It is true that the combined causation theory was not specifically addressed during the hearing. But the Special Master extensively questioned the key CCAM proponent, Dr. Anderson, regarding the relationship between Natalie's DPT-induced somnolence and her CCAM. Counsel for Respondent noted the factfinder's interest in the topic, and he used his first opportunity on re-direct to address the issue with Dr. Anderson:

Q The somnolence or the sleepiness that Natalie demonstrated, just to clarify, could that be a symptom of CCAM?

A Yes.

SPECIAL MASTER MILLMAN: Was it a symptom?

BY MR. MacLEOD:

Q Was it more likely than not, do you think in retrospect, a symptom of the CCAM?

A I think it was probably not because she just had a DPT. She had a lot of trauma put on her ... she screamed and made a lot of noise and, and got exhausted and took a few sips of her bottle, and then had a DPT, which was going to make her tired.

So, to be honest, I really don't think somnolence was the major issue here.

Dr. Anderson chose to downplay the importance of the child's somnolence altogether. There is no doubt about her opinion on this score. Perhaps she could have been more forceful, or elaborated as she did in her post-hearing statements. But counsel must live with their witnesses' testimony; they do not usually get a chance to do it better a second time.

Second, the Special Master's explanation was hardly out of left field. Faced with two opposite and irreconcilable hypotheses to explain Natalie's death, it is perfectly reasonable to expect counsel to consider and to

prepare his expert witnesses to rebut an explanation that combines both causes. Once the Petitioner satisfies his burden of establishing a *prima facie* case, the Government is required to offer an independent cause. Part of that requirement entails showing the fact-finder that the Government's cause is independent, and not a contributing or aggravating factor. It was counsel's responsibility, as part of his case, to rebut the possibility that the Special Master might view CCAM as a contributing, but not independent, factor.

Respondent's claim of "surprise" is unconvincing. Litigants under the Vaccine Act are not faced with an extraordinarily long list of possible evidentiary issues or grounds for compensation. As is demonstrated by our discussion of *Shyface*, Government counsel need not wait for the issue to be articulated by another before they are wary of theories of compound causation. For these reasons, the Court rejects the post-hearing proffers by Respondent of Dr. Anderson and Dr. Adelman, both of whom had ample opportunity during the hearing on this matter to express their opinions and, in fact, did so.

Recognizing the Special Master's expertise in the development of the novel procedures governing litigation under the Vaccine Act, this Court will not overturn the procedures employed unless it is unmistakably clear that an error has occurred. *Munn*, 21 Cl.Ct. at 348. In this case, the Special Master's decision was well within the letter and spirit of the Program. *Id.* at 350.

The issue before the Court is whether the Special Master's proceedings were conducted in a manner that was fundamentally fair. *See* 42 U.S.C. § 300aa–12(d)(3)(B); Vaccine Rules 3(b) and 8(b). The Government desires to put on further evidence to counter one theory of liability ultimately adopted by the Special Master. What trial attorney worth his or her salt would not try a case a bit differently once counsel knew what the fact-finder found important within the body of evidence? But fairness does not require that we accede to this all-to-human desire. In fact, under the circumstances it would impose an undue burden to delay the resolution of this case any further. The petition

has been pending eight years now, and Petitioners have surely exceeded compensable costs in litigating their case. *See Skinner v. Secretary of Department of Health and Human Services*, 30 Fed.Cl. 402, 410 (1994) (a special master is obligated to minimize the cost and complexity of the proceedings).

The Court finds that the Special Master carried out her obligation under Vaccine Rule 3(b) to afford each party a full and fair opportunity to present the case. The denial of Respondent's request to supplement the record with further expert evidence was well within her discretion, and has left this Court with a record sufficient to allow meaningful review of the case. Under the Vaccine Rules, which accord the Special Master wide latitude in the receipt of evidence, it is clear that the testimony by all proposed witnesses is not required. Vaccine Rule 8; *Skinner*, 30 Fed.Cl. at 409. Indeed, it is difficult to appreciate respondent's claim of unfairness in the Special Master's refusal to hear further evidence, given that the Special Master is not even required to hold an evidentiary hearing. Vaccine Rule 8(d); *Burns v. Secretary of Department of Health and Human Services*, 3 F.3d 415 (Fed.Cir.1993).

Furthermore, the Court concludes that any error in denying the Government an opportunity to rebut the Special Mater's theory of causation was harmless. It could hardly have come as a surprise that Dr. Anderson and Dr. Adelman disagreed with any theory other than CCAM as the exclusive cause, Dr. Anderson directly, and Dr. Adelman because he agreed with Dr. Anderson's opinion. They had already expressed this view. The proffers merely reiterated their rejection of an alternate theory. No technical or scientific evidence was proffered. Therefore, the evidence sought was cumulative and did no more than challenge the conclusion of the fact-finder.

## CONCLUSION

For the foregoing reasons, Respondent's Motion for Review is denied. The decision of the Special Master, dated December 29,

1998, is affirmed. The Clerk of Court shall enter judgment accordingly.